JAKE Z. SCHRUM AND RUBY E. SCHRUM, DANNIE L. SCHRUM AND JEANETTE V. SCHRUM, AND DONALD L. MOORE AND JUDITH A. MOORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schrum v. Commissioner
Docket No. 4859-91
United States Tax Court
T.C. Memo 1993-124; 1993 Tax Ct. Memo LEXIS 124; 65 T.C.M. (CCH) 2207; March 30, 1993, Filed *124 For petitioners: Donald L. Moore. For respondent: Scott Anderson. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: By separate notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Jake Z. Schrum and Ruby E. Schrum
Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
6653(a)(1)(B)
6661
1984
$ 20,735
$ 1,037
[1]
-0-
-0-
$ 5,184
1985
12,539
627
[1]
-0-
-0-
3,135
1986
4,816
-0-
-0-
$ 241
[2]
-0-
1987
9,268
-0-
-0-
436
[2]
2,317
Dannie L. Schrum and Jeanette V. Schrum
Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1986
$ 11,708
$ 585
[1]
$ 1,657
*125 Donald L. Moore and Judith A. Moore
Year
Deficiency
Additions to Tax
1981
$ 2,665
-0-
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues to be decided are: (1) Whether petitioners are entitled to investment credits for certain self-service carwash facilities; (2) whether petitioners are entitled to accelerated depreciation deductions for such facilities; (3) whether petitioners Dannie L. and Jeanette V. Schrum and Jake Z. and Ruby E. Schrum are liable for the negligence additions to tax; and (4) whether petitioners Dannie L. and Jeanette V. Schrum and Jake Z. and Ruby E. Schrum are liable for the addition to tax for substantial understatement. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. We incorporate the parties' stipulations in this Memorandum Opinion. At the time petitioners filed their joint petition, they resided in Virginia. During August 1982, petitioners Jake Z. Schrum, Dannie L. Schrum, and Donald L. Moore (hereinafter collectively *126 referred to as petitioners) formed a general partnership under the laws of Virginia known as Peninsula Enterprises (the partnership). Petitioners are general partners in the partnership, and at all times, petitioners each owned a one-third interest in the partnership. The partnership's primary purpose is to own and operate self-service carwash facilities. During 1984, the partnership designed and built its first carwash facility on Aberdeen Road in Hampton, Virginia (Aberdeen carwash). On November 30, 1984, the Aberdeen carwash began operating. The total cost of the Aberdeen carwash was $ 114,401.95. Petitioner Dannie L. Schrum personally supervised the construction of the Aberdeen carwash and all carwash facilities subsequently built by the partnership. During the fall of 1984, the partnership began construction of a second carwash facility which was located on Kecoughtan Road (Kecoughtan carwash) in Hampton, Virginia. On January 5, 1985, the Kecoughtan carwash began operating. The total cost of the Kecoughtan carwash was $ 108,968.58. Also during the fall of 1984, the partnership negotiated to purchase four operating carwash facilities and a site for a fifth carwash facility *127 from National Pride. On November 27, 1984, the partnership purchased from National Pride four operating carwash facilities, certain equipment to be used in the construction of two additional carwash facilities, and the site intended to be used for constructing another carwash facility. In connection with such purchases by the partnership, National Pride prepared an invoice for the carwash facilities it sold to the partnership. The invoice, which petitioners did not sign, is dated December 13, 1984, and provides as follows: The equipment, building and improvements, excluding the land at the four (4) National Pride Carwashes Installed Equipment
$   690,000
Buildings
410,000
Other Improvements
40,000
$ 1,140,000
Located at:
1)  1845 Laskin Road, Virginia Beach, VA
2)  411 Denbigh, Newport News, VA
3)  11127 Jefferson Ave., Newport News, VA
4)  3689 Virginia Beach Blvd., Virginia Beach, VA
Purchaser responsible for any and all sales taxes.
Two complete self service
carwash packages for a 6 bay
and 8 bay facility
$   210,000
Purchaser responsible for any and all sales tax. The partnership designed and built two additional carwash facilities: A carwash facility *128 on Witchduck Road in Virginia Beach, Virginia, which cost $ 114,404.41 and a carwash facility on Warwick Boulevard in Newport News, Virginia, which cost $ 131,911.32. Although the partnership did claim depreciation on the Warwick carwash facility, it did not claim an investment credit for that facility because the partnership anticipated selling it. All of the carwash facilities are substantially identical except for the number of bays. All of the structures of the carwash facilities were designed for use as self-service carwashes. None of the carwash facilities have been used or were intended to be used for any purpose other than to wash cars. The structures of the carwash facilities are designed to meet the functional requirements for washing cars and disposal of the waste water. The design requires a site suitable for the high volume use. A suitable site includes sufficient access to support a drive-through arrangement with stacking lanes. Depending on the location, the carwash facilities contain six, eight, nine, or ten bays. The bays are approximately 22 feet long and 15 feet wide. The carwash facilities are self-service facilities in which the customers wash their *129 own cars, boats, motorcycles, lawn mowers, or other equipment. The customers may select water with or without soap added, and they may select a low or high water pressure. The carwash facilities have larger than normal water supply meters and drain lines and have electricity and gas supplies which are larger than those required for normal building usage. The water and electricity are used only in running the equipment. Each bay is served by individual drainage lines leading to separate underground pits for collecting and removing dirt and sediment from the water. To meet the municipal's requirements for discharge of waste water into the municipal's sewage system, a second large underground settling tank is installed for further removal of sediment. The settling tanks are located under sloped, reinforced concrete slabs with grates which function both as a water collection device and as a top for the tanks. The design of the carwash facilities also includes single vertical walls between the bays. The walls between the bays prevent customers from spraying water into the next bay and guide water down to the sloped floor, through the grates, and into the holding tanks under the *130 floor. Also, the walls partially enclose a vault which contains coins deposited by the customers. Mounted on the walls are the coin meters and switches, electrical wires to the switches, brackets for the carwashing wands used by the customers, and the hoses to the wands. The mat holders and high and low pressure piping for each bay are also mounted on the walls. Attached to the top of the walls are beams which provide necessary structural reinforcement at the top of each wall. Mounted from the beams are the booms, swivels, and hoses which provide the water to the customers, the electrical lines, and high pressure pipes. For cosmetic purposes, the partnership installed a thin aluminum or galvanized tin cover on top of the beams. The cover is attached to the beams without seals and contains holes for pipes to penetrate into the bays. The cover is not watertight. With the exception of two carwash facilities, the ends of the bays are completely open. None of the carwash facilities have doors on the bays. Additionally, the bays do not have foundations which would support a wall or door on the open ends. Each carwash facility has a single equipment room, the same size as a single *131 bay. The equipment room contains the main pumps, electrical switching gear, water heaters, boilers, compressors, soap tanks, secondary circulating pumps, motors, mixing tanks, water retention tanks for the pumps, rinse tanks, controls, timers, water softeners, solenoids, valves, circuit breakers, and electrical panels. The equipment room is used solely to house the equipment and is not insulated or air conditioned. The equipment room, however, has heating equipment to heat the water and prevent pipes from freezing in the winter. The equipment room has no ventilation or windows. The equipment room has no storage or working space other than space for maintenance of the equipment. The carwash facilities do not have rest rooms. The partnership has a maintenance crew that maintains all of its carwash facilities. The maintenance crew cleans, inspects, and repairs the carwash facilities as required. A regular and routine part of the maintenance is the replacement of signs, hoses, vacuums, coin changers, vacuum hoses, nozzles, and coin meters. Normal maintenance includes regular rebuilding, replacement, or repair of pumps, hot water heaters, compressors, mixers, solenoids, valves, *132 piping, and other equipment. The partnership's employees only service the equipment and grounds. The Aberdeen carwash is a six-bay, self-service facility. During the examination process, the examiner allocated the costs of the Aberdeen carwash as follows: Aberdeen
Examiner
Description
Cost
Equipment
Building
% Equip.
Equipment
$ 39,423.00
$ 39,423
100  Freight
905.88
906
100  Labor
17,045.59
8,523
$ 8,523
50  Equipment
installation
7,919.00
7,919
100  Metal
8,276.42
8,276
0  Sand, mortar,
bricks
7,921.22
7,921
0  Concrete
10,071.13
10,071
0  Masonry
7,322.38
7,322
0  Plumbing
1,115.65
669
446
60  Electrical
7,200.00
3,600
3,600
50  Engineering
847.50
848
0  HRSD fee
1,950.00
1,950
0  Sewer
2,622.56
2,623
0  Water conn.
530.06
530
0  Eq. rental
548.00
548
0  Plumbing supplies
703.56
704
100.1
Total
$ 114,401.95
$ 61,744
$ 52,658
54  For the other two carwash facilities built by the partnership, respondent allowed, for investment credit purposes, the same percentage of the aggregate costs as respondent allowed for the Aberdeen carwash, exclusive of the cost of the equipment *133 packages. For the carwash facilities purchased by the partnership, respondent allowed an investment credit based on the allocation of the purchase price between equipment and buildings contained in the National Pride invoice. On January 10, 1991, respondent issued a statutory notice of deficiency for taxable year 1981 to petitioners Donald L. Moore and Judith A. Moore. On January 10, 1991, respondent issued a statutory notice of deficiency to petitioners Jake Z. and Ruby E. Schrum for taxable years 1984, 1985, 1986, and 1987. On January 10, 1991, respondent issued petitioners Dannie L. and Jeanette V. Schrum a statutory notice of deficiency for taxable year 1986. OPINION The first issue we must decide is whether petitioners are entitled to an investment credit for their share of the partnership's investment in the carwash facilities. Respondent determined that only a portion of each carwash facility qualifies for an investment credit. Petitioners contend that they are entitled to their respective shares of an investment credit based upon the partnership's entire investment in each of the carwash facilities it built or purchased. Section 38 allows an investment credit against *134 income tax pursuant to sections 46 and 48. Section 46(a) and (c) allows a credit of a specified percentage of an investment in qualifying property. Section 48(a)(1) defines qualifying property, known as section 38 property, as: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) SECTION 38 PROPERTY. -- (1) IN GENERAL. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property (other than an air conditioning or heating unit), or (B) other tangible property (not including a building and its structural components) but only if such property -- (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or
* * * Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * *
We discuss separately the two distinct categories *135 of section 38 property created by section 48(a)(1)(A) and (B). Section 48(a)(1)(A)
Pursuant to section 48(a)(1)(A), "tangible personal property" is considered section 38 property. In defining the term "tangible personal property", section 1.48-1(c), Income Tax Regs., provides: the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings and other inherently permanent structures (including items which are structural components of such buildings or structures). * * * Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.
With the exception of certain inherently permanent structures which are property in the nature of machinery or equipment, neither inherently permanent structures nor buildings qualify as tangible personal property. Munford, Inc. v. Commissioner, 87 T.C. 463 (1986), *136 affd. 849 F.2d 1398 (11th Cir. 1988); sec. 1.48-1(c), Income Tax Regs. Petitioners contend that the carwash facilities are not inherently permanent structures. In considering whether the carwash facilities are inherently permanent structures the following questions must be resolved: (1) Is the property capable of being moved, and has it actually been moved? (2) Is the property designed or constructed to remain permanently in place? (3) Do circumstances exist which tend to show the expected or intended length of affixation? (4) How substantial a task is removal of property and how time consuming? (5) How much damage will the property sustain upon removal? (6) What is the manner of affixation of the property to the land? McKenzie v. Commissioner, 85 T.C. 875 (1985); Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664 (1975). Petitioners have not persuaded us that the carwash facilities are not inherently permanent structures. The carwash facilities are constructed of concrete foundation and brick walls which indicate that they are designed and constructed to remain permanently in place. *137 Petitioners have not shown that the carwash facilities are readily removable or that they would not be substantially damaged upon removal. Consequently, we hold that the carwash facilities are inherently permanent structures. Although the structures are inherently permanent, petitioners contend that the carwash facilities qualify as tangible personal property because the facilities are "property in nature of machinery" or equipment. Munford, Inc. v. Commissioner, supra at 490; Weirick v. Commissioner, 62 T.C. 446 (1974). Petitioners base their alternative contention on the argument that the entire carwash facility operates as "nothing more than an automatic vending machine that sold water and collected and processed the sewer water." Petitioners rely on Weirick v. Commissioner, supra, in which we considered whether certain line towers used in the operation of a ski lift were section 38 property. We held that the line towers were so affixed to the ground as to be considered inherently permanent structures. Although the line towers were inherently permanent structures, we noted *138 that attached to the line towers was additional equipment which was property in the nature of machinery and that the line towers had no function other than supporting such equipment. The towers and equipment were physically connected, and when it was necessary to replace the equipment, it was often as economical to replace the tower also. We decided, therefore, that the line towers and equipment were so closely related that they formed an integral mechanism which was property in the nature of machinery. Consequently, we held that the line towers were eligible for the investment credit. We did not hold that the line towers were property in the nature of machinery merely because they were part of the ski lift. Munford, Inc. v. Commissioner, supra at 492. Rather, we based our holding upon the close relationship of the line towers to other property, which was itself property in the nature of machinery. Additionally, we specifically declined to hold that the entire ski lift was property in the nature of machinery. A more apt comparison, however, may be drawn with the facts of Munford, Inc. v. Commissioner, supra, *139 which involved a refrigerated storage facility on which the taxpayer had claimed an investment credit. The Commissioner only allowed an investment credit for certain refrigeration components such as pipes and pipe insulation, valves, and motors. The taxpayer sought an investment credit for the structural elements of the refrigerated area, including the foundation, footings, walls, floor, roofing and supports, vapor barrier, insulation, and electrical components allocable thereto. In Munford, the taxpayer argued that, although the property in issue was an inherently permanent structure, the property qualified as tangible personal property in the nature of machinery, similar to the line towers in Weirick. The taxpayer asserted that the structural elements of the refrigerated area operated together with the refrigeration system to make the refrigerated area function like one large refrigerator or freezer. We held, however, that the proper application of Weirick requires us to focus on the individual structural elements of the refrigerated area, rather than the facility as a whole. We held that the individual structural elements of the refrigeration facility were not *140 property in the nature of machinery because such elements were fixed in place and did not serve a machinery type function and, therefore, they were not so closely related to other property as to be considered property in the nature of machinery. We stated, however, that if it became necessary to replace the equipment, and it would have been as economical to replace the whole refrigeration facility, including the structural elements, as it would have been to replace only the equipment, we would have considered that fact as an indication that the structural components and the refrigeration equipment were so closely related as to be considered property in the nature of machinery. The taxpayer, however, made no such showing. Moreover, we stated that, if the purpose of the structural elements simply had been to support and assist the functioning of other property in the nature of machinery, we would have considered that fact as a further indication that the structural components and the machinery were so closely related that the structural components should be considered property in the nature of machinery. The structural elements, however, served a function independent of the machinery, *141 such as keeping out humidity, reducing temperature migration, and providing an enclosed, protected space in which frozen foods may be stored. Munford, Inc. v. Commissioner, 87 T.C. 463, 492-493 (1986), affd. 849 F.2d 1398 (11th Cir. 1988). In the instant case, the structural elements of the carwash facilities are similar to the structural elements involved in Munford. As in Munford, in the instant case, petitioners have failed to show that if it became necessary to replace the equipment in the carwash facility that it would be as economical to replace the entire carwash facility, including the structural elements, as it would have been to replace only the equipment. Additionally, the following testimony of petitioner Dannie L. Schrum reveals that the structural elements in question have functions separate and apart from merely supporting the equipment: Q: Would you explain in detail what it is in a carwash that collects this water and makes it suitable for disposal into the sewage system? * * * A: First you have partitions or deflector walls in between the bays so that when any water is sprayed by the *142 customer on his car it can't go over and hit the person in the next bay to him, for instance, who might be drying off his car. These deflector walls bring the water down to the sloped floor which passes the water on into a holding tank, through a grate into a holding tank, large tank under the floor. The water is piped from that tank to a settling tank at each bay. The settling tanks are partitioned to where the water drops at different levels so that all the sediment settles out of the water before it gets to the storm sewer system or sewage system.
On cross-examination, he further testified: Q: Now we talked about the purpose of the walls. Do the walls provide shelter for the people washing their cars? A: Shelter? Q: Shelter from the wind. A: Yes, it would keep the wind off. Mainly it's to protect them from water spraying in the pit next to them. Q: We talked about the beams that go across the walls. Is that the way -- Do the beams connect the walls? A: The beams do connect from the equipment room to wall to wall because there's no lateral restraint on those walls other than those beams. Q: What are those beams made out of? A: Metal. * * *143 * Q: Do they supply support for the walls? A: They provide lateral support for the walls. Q: Now we talked about a cover and a ceiling. Are we also talking about something that I might call a roof? * * * Q: You said that the purpose of the cover was strictly for cosmetic purposes, is that correct? Is that what you said on direct? A: Yes, I think it's about the same.
Consequently, as in Munford, the structural elements have an independent function, which indicates that the structural elements are not so closely related to the machinery that the structural components should be considered in the nature of machinery. Munford, Inc. v. Commissioner, supra.Based on the foregoing, we hold that the structural elements of the carwash facilities are not property in the nature of equipment or machinery. Accordingly, we hold that petitioners are not entitled to an investment credit under section 48(a)(1)(A) beyond that allowed by respondent. Section 48(a)(1)(B)
Petitioners also contend that the carwash facilities qualify as other tangible property under section 48(a)(1)(B). They contend that the carwash facilities are *144 "used as an integral part of * * * furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services". We disagree. Waste water from the carwash facilities passed through a sediment tank and then drained directly into the municipal sewers. Consequently, as we view it, the carwash facilities did not provide the sewage disposal. Rather, the municipalities provided it. Moreover, the fact that the carwash facilities increased the temperature and pressure of the water does not lead to the conclusion that the facilities provided water services. Rather, the municipalities provided it. To accept petitioners' characterization of the services provided by the facilities would run afoul of Congress' intention that the terms "water" and "sewage disposal" services be given their commonly accepted meaning. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 516; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 859. The sediment tank treatment that was a part of the carwash facilities was merely incidental to the primary service of washing cars. We think that the commonly accepted *145 meaning of water or sewage disposal services is more akin to a utility which provides the service as its primary function. See Westroads, Inc. v. Commissioner, 69 T.C. 682 (1978) (investment credit permitted for electrical equipment installed to generate power for shopping center tenants); Evans v. Commissioner, 48 T.C. 704 (1967) (investment credit not permitted for equipment to distribute water, electricity, and gas purchased from public utilities), affd. per curiam 413 F.2d 1047 (9th Cir. 1969). The primary function of the carwash facilities was to provide facilities in which customers could wash their cars, not to provide water or disposal services. See Morrison, Inc. v. Commissioner, 891 F.2d 857 (11th Cir. 1990), affg. T.C. Memo. 1986-129; Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739 (1985) (taxpayers which provided retail services held not in business of production within meaning of section 48), affd. 803 F.2d 1572 (11th Cir. 1986). Accordingly, we hold that *146 petitioners' carwash facilities do not qualify as other tangible. Separate Components
Petitioners alternatively contend that if they are not entitled to their claimed investment credit on the carwash facilities as a whole, they are nevertheless entitled to an investment credit for the separate components of each facility. As we have held that the carwash facilities do not fall within the requirements of section 48(a)(1)(B), if petitioners are to prevail on their separate components theory, the facilities must qualify under section 48(a)(1)(A) as tangible personal property. As to the structural elements of the carwash facilities, however, we have already considered such elements individually under our analysis of petitioners' argument that the carwash facilities are property in the nature of machinery or equipment. Munford, Inc. v. Commissioner, 87 T.C. 463, 492-493 (1986), affd. 849 F.2d 1398 (11th Cir. 1988). Moreover, petitioners have failed to prove that they are entitled to a credit greater than that determined by respondent, as they have failed to introduce sufficient *147 evidence to prove the amount and nature of such expenditures, Rule 142(a), or that such expenditures are for tangible property which qualifies for an investment credit. Sec. 48(a)(1)(A); sec. 1.48-1(c), Income Tax Regs.
We have considered all of petitioners' additional arguments regarding the investment credit for the carwash facilities and find them to be without merit. Accordingly, we hold that petitioners do not qualify for an investment credit greater than the amount respondent has determined. Depreciation
Next we must decide whether petitioners are entitled to depreciate the carwash facilities on a 5-year useful life schedule as section 1245 property under the Accelerated Cost Recovery System of section 168. Respondent has disallowed a portion of petitioners' claimed accelerated depreciation deduction because the carwash facilities do not entirely qualify as section 1245 property. Section 168(a) permits a depreciation deduction for recovery property. Recovery property is generally defined as "tangible property of a character subject to the allowance for depreciation -- (A) used in a trade or business or (B) held for the production of income". Sec. 168(c)(1). Recovery *148 property is assigned to a class of property under section 168(c)(2). Five-year property includes section 1245 property which is not 3-year property, 10-year property, or 15-year public utility property. Sec. 168(c)(2)(B). Section 1245(a)(3) defines section 1245 property using terms similar to those used in section 48(a)(1) to define section 38 property; i.e., personal property or other property "used as an integral part of * * * furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services". Additionally, section 1.1245-3(b)(1), Income Tax Regs., defines "personal property" to mean "tangible personal property" as defined in section 1.48-1(c), Income Tax Regs. As we have held above that the carwash facilities are not entirely tangible personal property and are not property used as an integral part of furnishing water or sewage disposal services under section 48, to the extent that the carwash facilities do not qualify as property under section 48, the carwash facilities cannot be section 1245 property. See Munford, Inc. v. Commissioner, supra at 496-497. Accordingly, as petitioners are not entitled to *149 depreciate the entire carwash facilities using a 5-year useful life under section 168 as section 1245 property, we conclude that petitioners are not entitled to depreciation deductions in excess of those allowed by respondent. Additions to Tax
1. Negligence
Respondent determined additions to tax against petitioners Dannie L. and Jeanette V. Schrum for negligence under section 6653(a)(1)(A) and (B) for taxable year 1986. Respondent also determined additions to tax against petitioners Jake Z. and Ruby E. Schrum for negligence under section 6653(a)(1) and (2) for taxable years 1984 and 1985 and under section 6653(a)(1)(A) and (B) for taxable years 1986 and 1987. Under section 6653(a)(1) and section 6653(a)(1)(A), if any part of an underpayment in a year is attributable to negligence, the addition is imposed on the entire underpayment for such year. Commissioner v. Asphalt Products Co., 482 U.S. 117 (1987). Negligence is a lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990); *150 Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving respondent's determination incorrect. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners assert on brief that in deciding to claim their investment credit and depreciation deduction, they consulted with tax advisers and attorneys. Although taxpayers are not required to seek professional tax advice, doing so can demonstrate that taxpayers acted reasonably. Hill v. Commissioner, 63 T.C. 225, 251 (1974), affd. without opinion sub nom. Tenner v. Commissioner, 551 F.2d 313 (9th Cir. 1977); Nelson v. Commissioner, 19 T.C. 575 (1952). No evidence, however, was introduced to support such assertion. To the contrary, petitioners' sole witness did not testify regarding any actions taken or advice received in considering the investment credits and depreciation deductions. Consequently, petitioners have failed to prove that they were not negligent. Accordingly, they are liable for the negligence additions determined by respondent. *151 2. Substantial Understatement
Respondent also determined an addition to tax under section 6661(a) against petitioners Dannie L. and Jeanette V. Schrum for taxable year 1986 and petitioners Jake Z. and Ruby E. Schrum for taxable years 1984, 1985, and 1987. An addition is proper under section 6661(a) if petitioners substantially understated their income tax for any taxable year in issue. The amount of the addition is 25 percent of the amount of any underpayment attributable to such understatement for such taxable year. Pallottini v. Commissioner, 90 T.C. 498 (1988). Section 6661(b)(2)(B) provides that the amount of the understatement shall be reduced by that portion of the understatement which is attributable to the taxpayer's treatment of any item if substantial authority existed for such treatment or any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. Petitioners do not claim that their returns adequately disclosed the facts affecting the tax treatment of the items in issue. Petitioners have the burden of proving respondent's determinations *152 under section 6661 are incorrect. Weis v. Commissioner, 94 T.C. 473, 490 (1990). In evaluating whether a taxpayer's position regarding the tax treatment of an item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be decided by using the same analysis that the Court would follow in evaluating the treatment of the item. Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6661-3(b)(3), Income Tax Regs. "Thus, an authority is of little relevance if it is materially distinguishable on its facts from the facts of the case at issue." Antonides v. Commissioner, supra at 702-703. We reviewed the authorities cited by petitioners above and found that they are materially distinguishable from the facts of the instant case. Consequently, the authorities petitioners cite are not substantial authority. Antonides v. Commissioner, supra. Accordingly, we hold that petitioners are liable for the section 6661 addition to tax. To reflect *153 the foregoing, Decision will be entered for respondent. Footnotes
1. 50 percent of the interest due on the deficiency.↩
2. 50 percent of the interest due on the deficiency.↩
1. 50 percent of the interest due on the deficiency.↩