WILLIAM C. LUCAS AND JOSEPHINE D. LUCAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lucas v. Commissioner
Docket No. 24445-87
United States Tax Court
T.C. Memo 1995-341; 1995 Tax Ct. Memo LEXIS 339; 70 T.C.M. (CCH) 191; July 26, 1995, Filed *339 Decision will be entered under Rule 155. William C. Lucas, pro se. For respondent: John Aletta. DAWSON, ARMEN
DAWSON; ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE ARMEN, Special Trial Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes for taxable years 1980 and 1983 as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659(a)
6661(a)
1980
$ 3,637
$ 182
--
--
$ 1,091
--
1983
9,045
--
$ 452
[1]
1,984
[2] $ 608
*340 Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c), formerly section 6621(d), for both of the taxable years in issue. The issues for decision are: (1) Whether petitioners' investment [2] in the Saxon Energy Brain System leasing program (the Saxon leasing program or the Program) should be disregarded for Federal income tax purposes; (2) whether petitioners are liable for additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2); (3) whether petitioners are liable for additions to tax for a valuation overstatement under section 6659(a); (4) whether petitioners are liable for an addition to tax for a substantial understatement of income tax under section 6661(a) for the taxable year 1983; and (5) whether petitioners are liable for the increased rate of interest under section 6621(c). FINDINGS OF FACT Some of the facts *341 have been stipulated, and they are so found. At the time that the petition was filed, both petitioners resided in Cuyahoga County, Ohio. Petitioner William C. Lucas (petitioner) is a college graduate. Petitioner Josephine D. Lucas (Mrs. Lucas) attended college, but did not receive a degree. During 1983, petitioner was employed as an air traffic controller and was a member of the National Association of Air Traffic Specialists. During 1983, Mrs. Lucas was employed as a computer systems analyst. Petitioners have no specialized training in either accounting or taxation. Petitioners' 1980 and 1983 Federal income tax returns were prepared by a certified public accountant, Ron Berardinis (Berardinis), who was associated with Graham & Associates, Inc. (Graham & Associates). Berardinis provided both tax and investment advice through Graham & Associates. Petitioner did not participate in the PATCO air traffic controllers' strike which was in effect during 1983. Due to the PATCO strike, petitioner worked overtime and earned more money in 1983 than he had in his earlier years of employment as an air traffic controller. Prior to 1983, petitioners had invested in mutual funds, in silver, and *342 in various stocks and bonds. In 1983, petitioners began to seek other investment opportunities. Berardinis recommended that petitioners consult Graham & Associates for investment advice. Petitioners met with Thomas Graham (Graham), the president of Graham & Associates, at some point in 1983. In their contacts with Graham & Associates, petitioners dealt primarily with Graham. Petitioners made a minimal effort to determine Graham's expertise as an investment adviser. Their investigation was limited to a single contact with the local chamber of commerce and a review of a document entitled "Business Advisor's Questionnaire" (the questionnaire) provided to them by Graham. In describing his present occupation and field of professional specialization, Graham wrote: President -- Graham & Associates -- four (4) years. Tax Planning and Tax Advantaged Investments
In describing his experience in the questionnaire, Graham wrote that he had "12 years experience in investing in Tax Advantaged Real Estate, Equipment Leasing and Oil & Gas projects." Graham advised petitioners of a variety of "tax-advantaged" investment opportunities. Graham did not subject petitioners to "pressure tactics". *343 Instead, he assured them that they could invest in the opportunities he was offering or wait to examine other opportunities. Petitioners chose to enter into four investments presented to them by Graham. Petitioners used available funds rather than borrowed money to invest. One of the investment opportunities proposed by Graham involved the Saxon Energy Corp. (Saxon). Saxon was a corporation formed in 1981 to lease energy management systems, such as the Energy Brain/Fuel Optimiser System A-1 (the Energy Brain System), to the public. See Schillinger v. Commissioner, T.C. Memo. 1990-640, affd. per order 1 F.3d 954 (9th Cir. 1993) (discussing the Saxon leasing program in some detail). Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. The only information petitioners received about the Energy Brain System was given to them by Graham & Associates. No documents relating to the Energy Brain System were introduced into evidence. In addition to Graham, petitioner also conferred with Berardinis *344 regarding the risks and benefits of entering into the Saxon leasing program. In his conversations with Berardinis, petitioner was particularly concerned that "as applicable to my tax returns, * * * we could count on * * * [Graham's] advice as being reliable." Petitioner did not show Berardinis the documents provided to petitioners by Graham because Berardinis indicated that, as an associate of Graham's, he had access to those documents. Petitioners conducted no independent investigation into the Saxon leasing program or into the value of the Energy Brain System, choosing to rely instead on Graham's representations and Berardinis' assurances as to their prospective investment in the Saxon leasing program. Petitioners understood that in order to receive tax benefits from an investment in the Energy Brain System in 1983, a payment would have to be made prior to the end of the taxable year. On or about December 29, 1983, an Agreement of Lease (the lease) was entered into by petitioners as lessees and Saxon as lessor. The lease involved a one-half interest in the Energy Brain System, an energy management device. The term of the lease was 20 years. The other one-half interest in the *345 Energy Brain System was held by Steven and Marsha Tracey (the Traceys). Graham arranged for petitioners and the Traceys to share an interest in the Energy Brain System. Petitioners have never met the Traceys nor have they ever spoken to them. Under the terms of the lease, petitioners were required to pay an advance guaranteed rental for the period December 31, 1983 through 1984, in the amount of $ 6,750 for their one-half interest in the Energy Brain System. [3] On or about December 29, 1983, petitioners signed a form entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". This form was not signed by any representative of Saxon. Petitioners never intended to use the Energy Brain System themselves. Instead, petitioners planned to engage a management company which would locate an end-user. The *346 end-user would pay for the Energy Brain System by sharing the amount of energy savings equally with petitioners. The management company was to retain a fee of 15 percent of petitioners' share of the energy savings and remit the balance to petitioners. Petitioners were then required to pay Saxon 75 percent of the remaining net income. Petitioners entered into a management agreement (the management agreement) with ALH Energy Management Corp. (ALH) as the management company for the Energy Brain System. An initial payment in the amount of $ 337.50 was contemplated. [4] Petitioners relied upon Graham to select ALH as the management company. Petitioners understood that Graham would be overseeing ALH's management activities. By letter dated July 18, 1984, K.M. Fereg (Fereg) of ALH notified petitioners that the *347 Energy Brain System had been placed in service in December 1983. The location of the Energy Brain System was identified in that letter as Our Lady of Lourdes Church & School, which was in Bettendorf, Iowa. After petitioners entered into the lease, communications regarding petitioners' investment in the Energy Brain System related primarily to petitioners' concerns about the viability of the investment as a tax shelter. Petitioners "kept no * * * meticulous records of events or conversations" relating to their investment in the Energy Brain System. Four experts (the experts) in the fields of energy management systems, design engineering evaluation methods, and energy system modeling prepared a study for respondent entitled "An Assessment of the Fair Market Value and the Profit Potential of the Energy Brain 1983A, 1 through 4" (the Experts' Study). In evaluating the fair market value and the profit potential of the Energy Brain System, the experts considered, among other things, the Information Memorandum and other promotional literature provided by Saxon (the Information Memorandum), the terms of the lease entered into by petitioners and Saxon, and publicly available trade catalogs *348 and magazines. They also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. On the basis of the Experts' Study, the experts concluded that the fair market value of the Energy Brain System did not exceed $ 795. They also concluded, on the basis of the Experts' Study, that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. The Experts' Study concluded as follows: Without the substantial tax benefit of the investment tax credit based on the Saxon Energy evaluation of worth, the taxpayer can only lose money on the Saxon Energy lease arrangement under the terms of the lease and over the reasonable life of the equipment.
Petitioners do not seriously dispute these conclusions. We think the conclusions are supportable, and we adopt them as our own. See Schillinger v. Commissioner, T.C. Memo. 1990-640. During 1982 and 1983, there were many products comparable to the Energy Brain System being marketed due to the nation's energy conservation needs. Energy management systems were available at the retail *349 level, for prices ranging from a few hundred dollars to hundreds of thousands of dollars. The variation in prices of energy management systems was the result of differences in the number of functions controlled by each such system. For example, a more elaborate system would control heating, air conditioning, lighting, and ventilation. Such a system would likely also serve other purposes, such as security, fire protection, and various monitoring functions. The Energy Brain System controlled only heating, a fact that was indicated in the Information Memorandum. Accordingly, it would properly have been considered a relatively low-end model. Petitioners timely filed their income tax returns for the taxable years 1980 and 1983. Petitioners attached to their 1983 income tax return, which was prepared by Berardinis, Form 3468 (Computation of Investment Credit). On that form, petitioners reported a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment credit in the amount of $ 10,250. [5]
*350 Petitioners also attached a Schedule C in respect of their Saxon investment to their 1983 return. On the Schedule C, petitioners claimed as deductions a number of expenses, including lease expenses of $ 6,750 and a management fee of $ 338. Petitioners reported no gross receipts or sales in respect of the Saxon investment on the Schedule C. On Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed an investment credit carryback pertaining to their investment in the Saxon leasing program to the taxable year 1980 in the amount of $ 3,637. [6]
OPINION We *351 begin by noting that, as a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S 111, 115 (1933). As a general rule, the taxpayer also bears the burden of proof as to each of the additions to tax and the increased rate of interest. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). If we conclude that petitioners are not liable for the addition to tax under section 6659(a) for 1983, then respondent will bear the burden of proving that petitioners are liable for the addition to tax under section 6661(a) for the increased amount asserted in her amended answer. Rule 142(a). Deficiencies in Income Taxes
Respondent determined deficiencies in petitioners' Federal income taxes for 1980 and 1983 in the respective amounts of $ 3,637 and $ 9,045. The deficiencies are based on respondent's disallowance of all credits and expenses claimed by petitioners with respect to their investment in the Energy Brain System. At trial, petitioners withdrew their concession that they are *352 liable for these deficiencies. We consider the deficiencies determined for both years together because the deficiencies relate to petitioners' 1983 investment in the Energy Brain System. In determining whether petitioners' investment in the Saxon leasing program should be disregarded for Federal income tax purposes, we apply a two-part test. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; Peat Oil & Gas Associates v. Commissioner, 100 T.C. 271 (1993), affd. sub nom. Ferguson v. Commissioner, 29 F.3d 98 (2d Cir. 1994). The threshold question is whether the transaction has economic substance. If the answer is yes, the question becomes whether the taxpayer was motivated by profit to participate in the transaction. Rose v. Commissioner, 868 F.2d 851, 853 (6th Cir. 1989); Mahoney v. Commissioner, 808 F.2d 1219, 1220 (6th Cir. 1987). If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for *353 federal tax purposes, and the second inquiry is never made. The proper test for whether "a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses." If the transaction lacks economic substance, then the deduction [or credit] must be disallowed without regard to the niceties of the taxpayer's intent. [Pasternak v. Commissioner, supra at 898].
Although already noted above, we must emphasize that the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S 111, 115 (1933). At trial, petitioners argued vigorously that no deficiencies exist because petitioners had a subjective economic profit objective. Petitioners did not, however, address the first prong of the applicable test, namely, whether their investment in the Saxon leasing program had any economic substance. In fact, petitioners essentially conceded that the conclusions of the Experts' Study were accurate. Petitioners presented no evidence to challenge those conclusions, *354 and we have adopted those conclusions as our own. In evaluating the fair market value and the profit potential of the Energy Brain System, the experts considered, among other things, the Information Memorandum and other promotional literature, the terms of the lease entered into by petitioners and Saxon, and publicly available trade catalogs and magazines. They also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. The experts concluded that the fair market value of the Energy Brain System did not exceed $ 795. They also concluded that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. The Experts' Study concluded that Without the substantial tax benefit of the investment tax credit based on the Saxon Energy evaluation of worth, the taxpayer can only lose money on the Saxon Energy lease arrangement under the terms of the lease and over the reasonable life of the equipment.
On the basis of the evidence before us, we are compelled to conclude that the Saxon leasing program which petitioners entered into had no practical *355 economic effects other than the creation of tax benefits. Because such program was an economic sham and petitioners' investment therein had no practical economic effects other than the creation of tax benefits, we also conclude that such investment must be disregarded for Federal income tax purposes. Pasternak v. Commissioner, supra; Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir. 1992) ("If the transaction lacks economic substance, then the deduction must be disallowed without regard to the 'niceties' of the taxpayer's intent"), affg. T.C. Memo. 1991-449. Our conclusion that petitioners' investment in the Energy Brain System was devoid of practical economic effects other than the creation of tax benefits eliminates the need for us to consider, in deciding petitioners' liability for the disputed deficiencies, whether petitioners had a subjective profit objective for making the investment. However, as discussed below with regard to the additions to tax for negligence, we conclude that petitioners did not have a subjective profit objective when they invested in the Energy Brain System. In *356 view of the foregoing, we sustain respondent's deficiency determination for the taxable years in issue. Negligence
Respondent determined that petitioners are liable for additions to tax for negligence for the taxable years in issue. Section 6653(a) for 1980 and section 6653(a)(1) for 1983 impose an addition to tax if any portion of an underpayment is due to negligence or intentional disregard of rules or regulations. For 1983, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In order to prevail on the issue of negligence, petitioners are obliged to prove that their actions in connection with the Saxon transaction were reasonable in light of their experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). Within this framework, petitioners may prevail if they *357 reasonably relied on competent professional advice. Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." Id. at 888. When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which the taxpayers approached their investment. In this case, petitioners contend that their actions, particularly their reliance on Graham & Associates, were reasonable. Petitioners had no experience or knowledge with respect to the acquisition, lease, production, installation, marketing, or use of energy management systems during the taxable years in issue. Petitioners' lack of knowledge regarding their proposed investment in the Energy Brain System should have prompted them to conduct some independent investigation before investing through Graham & Associates. Nonetheless, petitioners conducted *358 virtually no independent investigation regarding either the expertise of Graham & Associates or the economic viability of the proposed investment in the Energy Brain System. We note that petitioners introduced no documents relating to the Energy Brain System into evidence, suggesting that petitioners chose never to request any written documentation concerning their investment in the Energy Brain System. See Recklitis v. Commissioner, 91 T.C. 874, 890 (1988); Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947) (the failure of a party to introduce evidence which is within his possession may give rise to a presumption that, if produced, such evidence would be unfavorable). In an effort to persuade the Court that their actions in connection with the Saxon transaction were reasonable, petitioners attempted to distinguish themselves from the taxpayers whom this Court found to be negligent in Schillinger v. Commissioner, T.C. Memo. 1990-640. *359 Petitioners' primary goal in attempting to distinguish the factual circumstances of their case from the factual circumstances in Schillinger v. Commissioner, supra, was to persuade the Court that their objective in investing in the Energy Brain System was to earn an economic profit, rather than to obtain tax benefits, and that their actions were reasonably calculated to achieve that objective. The factual distinctions identified by petitioners are not persuasive. For example, petitioners argue that, unlike the taxpayers in Schillinger v. Commissioner, supra, they did not maintain records relating to their investment in the Energy Brain System because they did not need to create a "paper trail" to prove the legitimacy of their investment. By contrast, we view the failure to maintain records as contrary to the mandate of section 6001 and the regulations promulgated thereunder, which require taxpayers to maintain records sufficient to permit verification of income and expenses. "When a taxpayer fails to maintain or make available such records, the negligence addition may be asserted." Frick v. Commissioner, T.C. Memo. 1983-733, *360 affd. without opinion 774 F.2d 1168 (7th Cir. 1985). Petitioners point out that the taxpayers in Schillinger v. Commissioner, supra, were cautioned by an independent accountant that the so-called tax advantages of the investment in the Energy Brain System were illusory. By contrast, petitioner testified that the advisers upon whom petitioners claim to have relied issued them no such warning. By not seeking independent advice, and by not conducting even a minimal independent investigation into the Energy Brain System as an investment, but rather by relying only on the assurances of Graham and his associates, petitioners attempted to wrap themselves in a veil of ignorance behind which they now seek to hide. Like the so-called tax advantages associated with petitioners' investment in the Energy Brain System, the veil of ignorance is illusory. Petitioners also contend that, unlike the taxpayers in Schillinger v. Commissioner, supra, they were not subject to "pressure tactics" by Graham & Associates whereby they felt compelled to invest in the Energy Brain System by the close of 1983. Instead, *361 they invested in the Energy Brain System "based on the relevant facts and material facts that were disclosed to them". Petitioners argue that this is an indication that they were not investing to obtain tax benefits but to obtain economic profits. By contrast, given the minimal information apparently provided to petitioners regarding their investment, we view this statement as tending to indicate either that petitioners relied on their own judgment, or, to the extent that they did rely on Graham, such reliance was far from reasonable. Finally, supporting our conclusion that petitioners' investment in the Energy Brain System was motivated by an interest in achieving tax benefits rather than economic profit is the fact that, prior to the time petitioners chose to invest in the Energy Brain System, Graham provided petitioners with a document entitled "Business Advisor's Questionnaire". In describing his present occupation and field of professional specialization, Graham wrote: President -- Graham & Associates -- four (4) years. Tax Planning and Tax Advantaged Investments
In describing his experience in the questionnaire, Graham wrote that he had "12 years experience in investing *362 in Tax Advantaged Real Estate, Equipment Leasing and Oil & Gas projects". The fact that one of the few documents petitioners received from Graham emphasized his involvement in "tax-advantaged investments" suggests that petitioners' interest in investing through Graham & Associates was to shelter their existing income from taxation, rather than to generate additional income. Petitioners' postinvestment communications regarding the Energy Brain System did not constitute an effort to monitor their investment. Rather, on the basis of the facts developed at trial, we conclude that such communications related to petitioners' concerns regarding the viability of the Energy Brain System investment as a tax shelter. Petitioners have failed to persuade us that their actions in connection with their investment in the Energy Brain System were reasonable in light of their experience and the nature of their investment. Moreover, we are convinced that petitioners did not have a subjective profit motive in investing in the Energy Brain System in 1983. Accordingly, we sustain respondent's determination with respect to the additions to tax for negligence for the taxable years in issue. Valuation *363 Overstatement
We turn now to the addition to tax for a valuation overstatement. Such an addition to tax may be imposed if an underpayment of tax attributable to a valuation overstatement equals or exceeds $ 1,000. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6659(c)(1). In the event that the reported value exceeds 250 percent of the correct value, an addition to tax of 30 percent of the underpayment of tax attributable to such overstatement is imposed. Section 6659 does not apply, however, to underpayments of tax which are not attributable to valuation overstatements. Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987) (where taxpayers were not entitled to claimed investment tax credits because property was not placed in service during the years in issue, the underpayment was not attributable to a valuation overstatement). On their 1983 income tax return, petitioners claimed a value of $ 102,500 *364 for their one-half interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment credit of $ 10,250 and utilized $ 7,298 of that amount to reduce their reported tax liability (exclusive of alternative minimum tax) to zero. They also claimed as deductions a number of expenses relating to the Saxon investment, including lease expenses of $ 6,750. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their Saxon investment to the taxable year 1980 in the amount of $ 3,637. On the basis of the Experts' Study, we have concluded that the fair market value of the Energy Brain System did not exceed $ 795. Therefore, petitioners' valuation of the Energy Brain System constitutes a valuation overstatement. Sec. 6659(c)(1). We must now decide whether the deficiency in income tax for each of the taxable years in issue is attributable to the valuation overstatement. Sec. 6659(a); see, e.g., Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), *365 affg. T.C. Memo. 1988-427; Todd v. Commissioner, supra; Urbanski v. Commissioner, T.C. Memo. 1994-384. [7]
The deficiency for 1980 resulted from the disallowance of the investment credit carryback claimed by petitioners with respect to their 1983 Saxon investment. The deficiency for 1983 resulted, in part, from the disallowance of such credit and, in part, from the disallowance of deductions claimed by petitioners with respect to such investment. Nonetheless, as discussed below, we hold that no part of the deficiency for either year is attributable to a valuation overstatement because a valid election to transfer the *366 investment credit from lessor to lessee was never executed. Sec. 48(d)(1); Todd v. Commissioner, supra; Kerry v. Commissioner, 89 T.C. 327 (1987); sec. 1.48-4(f), Income Tax Regs.
In connection with their investment in the Energy Brain System, petitioners signed a document entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". Section 48(d)(1) provides, in relevant part: A person * * * who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary) elect * * * to treat the lessee as having acquired such property * * *.
The regulations promulgated under section 48(d)(1) (the Regulations) provide, also in relevant part: The election of a lessor with respect to a particular property (or properties) shall be made by filing a statement with the lessee, signed by the lessor and including the written consent of the lessee, containing the following information * * * [Sec. 1.48-4(f), Income Tax Regs.; emphasis added.] Although petitioners attempted to execute an election in accord with section 48(d), no Saxon representative signed *367 the form entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". In Kerry v. Commissioner, supra, the Court held that, in the absence of strict compliance with the Regulations, a valid election to transfer the investment tax credit from lessor to lessee could not occur. Because the Regulations require that the lessor actually sign a statement electing to transfer the investment tax credit to the lessee, no valid election was made in this instance. Accordingly, the underpayments of tax resulting from the disallowance of the investment credit are not attributable to the valuation overstatement that exists for each of the years in issue. Sec. 6659(a); Todd v. Commissioner, supra.
In view of the foregoing, we do not sustain respondent's determination that petitioners are liable for the additions to tax under section 6659(a) for a valuation overstatement. We note, however, that "Congress is, of course * * * free to change the result in cases such as this by imposing additions to tax or additional interest on underpayments attributable to transactions 'accompanied by a valuation overstatement'". Todd v. Commissioner, 89 T.C. at 921-922. *368 Understatement of Tax Liability for 1983
We turn next to the addition to tax for substantial understatement of income tax under section 6661(a) for 1983. Section 6661(a) imposes an addition to tax equal to 25 percent of the amount attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). [8]
We have already sustained respondent's determination that petitioners understated their income tax liability for 1983 by an amount in excess of $ 5,000, which is greater than 10 percent of the tax required to be shown on the return. We sustained respondent's deficiency *369 determination on the ground that the Saxon leasing program lacked economic substance. Respondent has carried her burden of proof with respect to the application of the increased addition to tax under section 6661(a). Accordingly, we sustain respondent's determination that petitioners are liable for the addition to tax under section 6661(a) and hold that it properly applies to the entire deficiency for 1983. See sec. 6661(c). Increased Rate of Interest
Finally, section 6621(c) provides for an increased rate of interest with respect to any underpayment in excess of $ 1,000 which is "attributable to one or more tax motivated transactions". Sec. 6621(c)(1) and (2). The increased rate of interest applies to interest accruing after December 31, 1984. See DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), affd. 862 F.2d 400 (2d Cir. 1988) (the increased rate of interest applies to interest accruing after December 31, 1984, even though the transaction in question was entered into before the date of enactment of section 6621(c)). Respondent determined that petitioner was liable for increased interest because the underpayments *370 for the taxable years in issue were attributable to tax-motivated transactions. Section 6621(c)(3)(A)(v) provides that the term "tax- motivated transaction" includes "any sham or fraudulent transaction". Economic shams, or transactions which lack economic substance, fall within the ambit of section 6621(c)(3)(A)(v). Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988). Here we have concluded that the Saxon transaction was an economic sham. Accordingly, we sustain respondent's determination that petitioners are liable for the increased rate of interest under section 6621(c) with respect to the deficiencies for 1980 and 1983. [9]
*371 Conclusion
In order to reflect our resolution of the disputed issues, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence; i.e. $ 9,045.↩
2. Respondent amended her answer to plead, in the alternative, that in the event that the Court concludes that the addition to tax under sec. 6659(a) does not apply, the addition to tax under sec. 6661(a)↩ should be increased to 25 percent of the entire deficiency, rather than 25 percent of the portion of the deficiency not attributable to an overvaluation of property.
2. The term "invest" and all of its derivatives are used solely for the sake of convenience throughout this opinion.↩
3. The parties stipulated a copy of the front of a check dated Dec. 29, 1983, from petitioners to Saxon in the amount of $ 6,750. The copy of the check stipulated does not show that the check was ever processed.↩
4. The parties stipulated to a copy of the front of a check dated Dec. 29, 1983, from petitioners to ALH in the amount of $ 337.50. The copy of the check stipulated does not show that the check was ever processed.↩
5. Of this amount, petitioners utilized $ 7,298 on their 1983 return in order to reduce their reported income tax liability (exclusive of the alternative minimum tax) for that year to zero. Petitioners reported alternative minimum tax in the amount of $ 685, which represented their total reported tax liability for 1983. Petitioners then claimed a refund in the amount of $ 14,763.↩
6. The sum of the investment credit claimed for 1983, $ 7,298, and the investment credit carried back to 1980, $ 3,637, equals $ 10,935, an amount in excess of the $ 10,250 claimed on Form 3468. Petitioners computed the unused investment credit available for carryback to 1980 as follows: ↩
1983 investment credit
$ 10,250
Less: amount claimed in 1983
-7,298
Balance
2,952
Plus: 1983 AMT
685
Unused ITC for carryback
$  3,637
7. Sec. 6659 applies to returns filed after Dec. 31, 1981. When an item carried back from a later year (such as 1983) to an earlier year (such as 1980) is "attributable to" the adjustments in the later years, sec. 6659 may be applied to returns filed before Jan. 1, 1982. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).
8. An understatement will be reduced to the extent that it is: (1) Based on substantial authority, or (2) adequately disclosed in the return or in a statement attached to the return. Sec. 6661(b)(2)(B)↩. In this case, the understatement for 1983 was neither based upon substantial authority nor adequately disclosed.
9. McCrary v. Commissioner, 92 T.C. 827, 857-860↩ (1989), does not compel a conclusion to the contrary because the deficiencies at issue herein were fully contested by petitioners.