T.C. Memo. 1998-101

UNITED STATES TAX COURT

CHARLES A. GREENE AND CHRISTINE J. GREENE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5296-94.                    Filed March 11, 1998.

<u>Michael J. Wenig</u> and <u>M. Robin Davis</u>, for petitioners.

<u>Ross A. Rowley</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

DEAN, <u>Special Trial Judge</u>:  This case was heard pursuant to
the provisions of section 7443A(b) and Rules 180, 181, and 182.[1]

In two separate notices of deficiency respondent determined
additions to petitioners' Federal income taxes for the years 1983

[1]All section references are to the Internal Revenue Code in
effect for the taxable years in issue.  All Rule references are
to the Tax Court Rules of Practice and Procedure.

and 1984 under section 6653(a)(1) in the amounts of $1,159.70 and $43.65, respectively.  Respondent also determined for both years additions to taxes under section 6653(a)(2) in the amounts of 50 percent of the interest due on the portion of the underpayments of taxes attributable to negligence.

Certain issues raised in this case by petitioners' Motion to Restrain Collection and respondent's Motion to Dismiss for Lack of Jurisdiction and to Strike the Claims Relating to the Deficiency Attributable to Partnership Items and Increased Interest Pursuant to I.R.C. Section 6621(c) were decided by the Court in Greene v. Commissioner, T.C. Memo. 1995-105 (Greene I).

By an amendment to petition, petitioners attempted to put at issue the period of limitations for the "deficiencies being assessed".  The Court found that the affected items deficiency notices here involved were mailed to petitioners within 1 year of the date of entry of decision in the partnership level proceedings in docket No. 5757-92.  See sec. 6229(d).  The Court also found that petitioners were not entitled to direct notice of the partnership level proceedings and that any reliance on Crowell v. Commissioner, 102 T.C. 683 (1994), is misplaced.

On brief petitioners state that they "believe that the Court has already ruled on the statute of limitations issue" in Greene I.  We agree, and we decline to revisit the issue.  See, e.g., Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C.

Cir. 1995); <u>Fagan v. City of Vineland</u>, 22 F.3d 1283, 1290 (3d Cir. 1994); <u>Sanders v. Sullivan</u>, 900 F.2d 601, 605 (2d Cir. 1990). The issues remaining for decision are: (1) Whether any part of an underpayment of income taxes for 1983 or 1984 is due to negligence or intentional disregard of rules or regulations; and if so, (2) whether the portion of the underpayment due to negligence is eliminated or reduced by petitioners' filing of an amended return reporting and paying additional income tax for the taxable year 1983.

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits received into evidence are incorporated herein by reference. At the time the petition in this case was filed, petitioners were residing in High Point, North Carolina.

### FINDINGS OF FACT

During the years 1983 and 1984, Charles A. Greene (petitioner) was a limited partner in a partnership known as Mid Continent Drilling Associates II (Mid Continent or the partnership). The additions to tax in this case relate to petitioner's investment in Mid Continent.

<u>Petitioners' Work and Business History</u>

Petitioner Christine Greene is a high school guidance counselor.

Petitioner has a high school diploma and no formal education in finance, accounting, investing, or in business planning. He has no specialized knowledge of the oil and gas industry. Petitioner does, however, have a long work history in the business world. Petitioner joined the military before graduating from high school and obtained his GED while serving in the Air Force. After leaving the Air Force petitioner worked as a salesman for Advanced Tire and Auto. For about 2½ years petitioner worked for Pilot Life Insurance Co. as a "debit sales person", then in the collection department of Dunn & Bradstreet for 5 years, and for 6 years with the Kay-Lynn Furniture Co. (Kay-Lynn).

While employed at Kay-Lynn in or around the year 1967, petitioner met Mr. Irv Corman[2] (Corman), an experienced certified public accountant. Petitioner wanted to start his own furniture manufacturing business and left employment with Kay-Lynn in 1972. Petitioner sought Corman's advice on how to start the business with very limited finances. Petitioner also sought advice from "Other people in the furniture industry, people who were in the business of retailing furniture, people who were in the manufacturing end * * * of furniture manufacturing."

_____

[2]Mr. Corman died on May 5, 1992.

Classic Gallery

Petitioner called his business Classic Gallery, and the corporation elected to file Federal income tax returns for the business as an S corporation. After the second or third year of operations, the business began generating enough income to allow petitioner to draw a salary. Before 1978 petitioner's average income was below $75,000. After 1978 the company's profits "blossomed", generating for petitioner a very substantial six-figure income in wages and dividends.

Over the years, Corman became petitioner's friend, associate, and chief adviser. Corman came to be retained on a monthly basis to provide accounting advice and services to Classic Gallery. As petitioner's furniture manufacturing business prospered, Corman began to suggest to petitioner how his earnings from the corporation might be invested. Although Corman presented various investment "possibilities" to petitioner, he was not separately compensated as an investment counselor.

Petitioner discussed the investment proposals with Corman, reviewed materials that Corman presented, and evaluated them "a number of different ways". Although petitioner relied on Corman to tell him if something was a "good investment", he did not "just blindly accept" Corman's recommendations. Petitioner rejected some investments presented to him by Corman.

Partnership Investments

One of the investments Corman recommended was in "GeoVest". Petitioner "understood" that the GeoVest investments were oil and gas partnerships. Reported on petitioners' 1981 and 1982 Federal income tax returns, prepared by Corman, were partnership losses from investments in "GeoVest Drilling Fund Ltd 1981-A" and "GeoVest Drilling Fund Ltd 1981-B" (GeoVest).[3]

In the middle of 1983, Corman recommended to petitioner a second investment in an oil and gas partnership, the Mid Continent partnership. Corman told petitioner that he had a client, William R. Fields (Fields), who had fallen on "hard times" and was unable to meet his cash investment obligation to the partnership. Fields had invested in the partnership in 1981. He was required to make the third of three yearly $10,000 cash capital contributions in 1983. Corman told petitioner that this was an opportunity for him to get into the partnership at a reduced investment amount. Corman said that the Mid Continent investment was "similar" to GeoVest, "had potential for return", and looked like it would be a "good investment".

---

[3]Petitioners also reported partnership income of $4,585 each from the "Green Lindsay Co" for 1981, and in 1982 partnership income of $2,529 each from the "Green Whiteside Co" and a partnership loss of $305 from "Hofel [sic] Associates of H. Pt.". The record contains no other description of these particular investments.

Petitioner's Evaluation of Mid Continent

Petitioner discussed with Corman the tax benefits he might receive from Mid Continent and as a result, he expected some "flow-throughs" of losses and investment tax credits. Petitioner "read some paperwork" about Mid Continent that included various forms and reports. At the time of his investment petitioner received and reviewed a document that bore the title "Terra Drill". He reviewed a partnership prospectus for Mid Continent, and he produced at trial a document the first page of which is numbered "35" and is entitled "Summary of Partnership Agreement". The second through eleventh and final pages of the document are numbered "B9" through "B18" and discuss solely tax aspects of the partnership.

Petitioner also received a subscription agreement for Mid Continent that he reviewed at the time he purchased his interest from Fields. Paragraph 2.(k) at page 3 of the four-page subscription agreement provides in part:

> I understand that no state or Federal governmental authority has made any finding or determination relating to the fairness for public investment of the Units in the Partnership and that no state or Federal governmental authority has recommended or endorsed, or will recommend or endorse, these Units.

Petitioner was aware that Corman did not have a "vast knowledge of oil and gas" matters and that Corman's advice on the Mid Continent partnership was based solely on his reading of the prospectus.

Through Corman, petitioner knew other individuals who were investors in Mid Continent. Before investing in the partnership in 1983, petitioner discussed with other investors the nature of "their involvement with Mid Continent". Petitioner "looked into" the activities of the partnership in 1981 and 1982 by reading accounting reports. On the basis of the discussions with other investors and the recommendations of Corman, petitioner considered the purchase of Fields' interest in the partnership to be "reasonable".

### The Deal With Fields

When Fields invested in the Mid Continent partnership in 1981, he agreed to make an initial cash payment of $10,000 and to make subsequent $10,000 cash payments in each of the years 1982 and 1983. Fields also agreed to become liable on a $120,000 "obligation" to Mitchell Petroleum Technology Corp. (Mitchell) that was to become due 13 years later, on January 15, 1994. During petitioner's negotiation with Fields over the purchase of his Mid Continent partnership interest, it was agreed from the beginning that petitioner would pay the last $10,000 cash capital contribution. But the negotiation focused on "What the amount of the investment was that we were to receive in terms of the value of the balance of the due--the amount that was still due" on Fields' obligation to Mitchell. They discussed whether Fields

would retain more than or less than 50 percent of the obligation to Mitchell.

On or about June 21, 1983, petitioner and Fields came to terms memorialized in an assignment of interest document. Petitioner purchased Fields' interest in Mid Continent by paying the final $10,000 capital call plus $600 interest and by assuming half of the $120,000 obligation to Mitchell.

Preparation of the 1983 and 1984 Returns

Corman subsequently prepared petitioners' 1983 Federal income tax return. Petitioners claimed an ordinary loss of $46,007 and an investment credit of $190 reflecting their share of Mid Continent losses and credits based upon the Schedule K-1 provided to them by the partnership.[4] Corman also prepared petitioners' 1984 return, on which they claimed a Mid Continent partnership loss of $1,633.[5]

The record does not reflect that petitioner made any further inquiry about or investigation into the operations of Mid Continent, even after he received notification in 1985 that the partnership was suing its accountants. Eventually, in early 1986

---

[4]In addition, petitioners reported partnership losses from "Hotel Associates of High Point" and GeoVest B, as well as partnership gains from GeoVest A and "Greene Whiteside Co".

[5]In addition, petitioners reported partnership gains from "Greene Whiteside Co" and GeoVest A, and partnership losses from GeoVest B, "Hotel Associates of High Point", "1600 Market Street Associates", "Elm Street Associates I", and "Ambassador Real Estate Investors L.P."

petitioner "became aware" that the Internal Revenue Service (IRS) was disallowing deductions related to the partnership. Corman suggested that petitioner confer with a tax attorney, which he did.

On the basis of his discussions with his attorney, petitioner developed "an understanding" that other taxpayers in his locale who had invested in Mid Continent were settling their controversies with the IRS. He understood that if they agreed to forgo their partnership deductions, the IRS would allow Mid Continent partners to deduct their "[cash] investment", such as the $10,000 payment he had made.

The Partnership Examination and Petitioners' Amended Return

On August 11, 1986, respondent mailed petitioner a notice of the beginning of an examination of Mid Continent's 1983 partnership return.

On or about December 29, 1986, petitioners filed an amended income tax return for 1983 (the amended return), along with a Notice of Inconsistent Treatment or Amended Return on Form 8082. Petitioners amended their 1983 return by reducing the $46,007 partnership loss with respect to Mid Continent by $36,007 and by eliminating an investment tax credit in the amount of $190. Petitioners remitted a total of $24,393 with the amended return, designating $18,194 as tax and $6,199 as interest.

Petitioners' reporting position, as set forth in the amended return and attached Form 8082, was based on their understanding of settlements purportedly entered into between respondent and other Mid Continent partners for taxable years 1981 and 1982.

The record in this case includes the transcript of account that respondent maintained for petitioners' 1983 taxable year. The transcript of account indicates that the payment of tax and interest that was remitted by petitioners with their amended return was posted to petitioners' account on December 29, 1986. Later, on March 9, 1987, respondent assessed $18,194 as an advance payment of an examination deficiency and $6,181.36 as a designated payment of interest.

There is no evidence in the record that petitioners filed an amended return for tax year 1984.

Partnership Litigation and Petitioners' Tax Assessments

In October of 1990 the Court filed its opinion in Webb v. Commissioner, T.C. Memo. 1990-556, remanded on a jurisdictional issue 17 F.3d 398 (9th Cir. 1994), holding that the activities of the partnership in 1981 and 1982 were not engaged in for profit and that the underpayments of taxes resulting from the deductions, losses, and credits claimed with respect to the partnership were attributable to negligence and to tax-motivated transactions.

In June 1991, respondent proposed a settlement for taxable years 1983 and 1984 regarding petitioner's investment in Mid Continent. Petitioners rejected the proposed settlement on the basis of the view that their tax liability was properly reported on the amended return.

On October 21, 1991, respondent mailed separate notices of final partnership administrative adjustment (FPAA's) to Mid Continent's tax matters partner (TMP) for the taxable years 1983 and 1984. Respondent did not mail a copy of either of the FPAA's to petitioners. A timely petition for readjustment, which was assigned docket No. 5757-92, was filed by partners other than the TMP.

On February 11, 1993, a decision was entered by this Court in the partnership proceeding. The decision served to sustain respondent's disallowance of the losses claimed by Mid Continent on its partnership returns for 1983 and 1984. No appeal was taken, and this Court's decision became final on May 12, 1993. Secs. 7481(a), 7483.

On December 27, 1993, respondent made an assessment against petitioners, relating to the taxable year 1983, for additional income tax in the amount of $5,000 and for unpaid interest in the amount of $13,633.01 computed at the increased rate established under section 6621(c). The tax assessed in the amount of $5,000 was based on the disallowance of the remaining $10,000

partnership loss that petitioners had not eliminated on the amended return. The assessment reflected a total tax liability for 1983, in respect of partnership items relating to Mid Continent, of $23,194 less the $18,194 that petitioners had previously designated as tax and remitted with their amended return.

On December 29, 1993, and February 9, 1994, respondent mailed notices of deficiency to petitioners in which there were determined additions to tax for negligence under section 6653(a)(1) and (2) for the taxable years 1983 and 1984, respectively. The additions to tax are affected items in that they are based on tax owing by petitioners as a result of adjustments to partnership items appearing on Mid Continent's partnership returns for 1983 and 1984.

OPINION

Petitioners argue that they are not subject to the additions to tax for negligence because: (1) The Internal Revenue Code should not punish negligent investing, only negligence in reporting tax obligations; (2) they, unsophisticated investors, relied in good faith upon the advice of a competent, independent professional on an investment activity known to be risky; and (3) if they are found to have been negligent, the payment of tax with the amended return for 1983 eliminates or reduces the 1983 year

underpayment of tax for purposes of the section 6653(a)(1) and (2) additions to tax.

Respondent's determinations, contained in the notice of deficiency, are presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Therefore, petitioners have the burden of proving that they were not negligent in this case. See Schrum v. Commissioner, 33 F.3d 426, 437 (4th Cir. 1994), affg. in part and vacating in part T.C. Memo. 1993-124; Estate of Mason v. Commissioner, 64 T.C. 651 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

Section 6653(a)(1) imposes an addition to tax if any "part of any underpayment" of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence.

Definition of Negligence Under Section 6653(a)

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Thus, to avoid imposition of the addition to tax, petitioners must show that their actions in connection with the deductions and credits from Mid Continent on their 1983 and 1984

Federal income tax returns were reasonable in light of their experience and the nature of the investment.  See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973); Lucas v. Commissioner, T.C. Memo. 1995-341.

Petitioners, citing Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228, caution the Court to distinguish carefully between "negligence" in making the underlying investment and the negligence reached by section 6653(a).  We find the correct standard to be announced in the section itself.  If any part of an underpayment of tax is due to negligence, it is subject to the additions to tax provided by section 6653(a).  See Sacks v Commissioner, 82 F.3d 918, 920 (9th Cir. 1996) (negligence in claiming a tax deduction depends upon both the legitimacy of the underlying investment and due care in claiming the deduction), affg. T.C. Memo. 1994-217; Novinger v. Commissioner, T.C. Memo. 1991-289; Rogers v. Commissioner, T.C. Memo. 1990-619.

Description of the Underlying Investment

The exact nature of the underlying partnership investment in this case is not clear directly from the record.  Some partnership documents were introduced into evidence, and the parties stipulated that the partnership possessed the rights to a device called the "Terra-Drill", which we discuss below.  But no prospectus or offering memorandum was produced, few facts on the

exact nature of the investment were stipulated, and no witnesses save for petitioner testified at trial. A fair reading, however, of the stipulation of facts and the briefs of the parties shows that they agree that the underlying facts of the partnership operations are as discussed in Webb v. Commissioner, T.C. Memo. 1990-556.[6]

In Webb v. Commissioner, supra, we found that the Mid Continent promotion offered limited partnership interests for sale by a confidential placement memorandum dated October 26, 1981. The partnership had an individual and a corporate general partner.

A related entity, Tround International, Inc. (Tround), was a company principally owned by David Dardick, who was attempting to develop a high speed oil and gas drill (the Terra-Drill). In November of 1980, Tround and Mitchell entered into an agreement granting to Mitchell for 5 years the right to use, lease, and

---

[6]For example, the parties have stipulated that in Webb v. Commissioner, T.C. Memo. 1990-556, the Court found that the activities of Mid Continent had no profit motive in 1981 and 1982 and that underpayments of tax related to partnership deductions, losses, and credits were attributable to tax-motivated transactions. In their brief, petitioners request a finding of fact that in Webb v. Commissioner, supra, the Court found "that the Partnership was a sham, and in a separate action [docket No. 5757-92] the Court subsequently disallowed all of the items relating to the Partnership's 1983 and 1984 tax years in a partnership-level TEFRA proceeding." It would be, in any event, petitioners' burden to prove the context in which their deductions and credits were taken. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

sell Terra-Drills in return for an advance license fee of $1,600,000. Mitchell thereafter sublicensed its rights to the Terra-Drill to nine different partnerships, including Mid Continent. The aggregate sublicense fee of the six partnerships involved in Webb was $225 million. Pursuant to its sublicense agreement with Mitchell dated December 31, 1981, Mid Continent was obligated to pay annual license fees of $8 million in the first 3 fiscal years commencing October 1, 1982, 1983, and 1984.

The Mid Continent offering memorandum set forth significant warnings regarding the risk of the investment. It also indicated that the anticipated tax losses to be incurred by each investor in the first 3 years would be $40,000 for each $10,000 cash investment.

The offering memorandum stated that the partnership was formed to: (1) Exploit the Terra-Drill; (2) conduct exploratory drilling in the Overthrust Belt in Utah; and (3) develop a drilling program in Oklahoma and Tennessee. Since a functional Terra-Drill was never developed, no orders were ever taken by the limited partnership for the Terra-Drill. No drilling was ever conducted by the partnership on leases in the Utah Overthrust Belt. The partnership never developed a drilling program for oil and gas in Oklahoma and Tennessee.

Petitioners' Arguments

Petitioners raise a plethora of arguments against their liability for the negligence addition to tax. Among the arguments raised are that petitioners: (a) Were "unsophisticated" investors with no formal training or work experience in investments; (b) relied on their accountant, Corman, in making the investment; (c) having obtained the "approval" of their accountant, should not be required to conduct a costly, independent investigation of the investment; (d) determined that the investment in oil and gas was by its nature "risky", profit-motivated, and "small" with a potentially high rate of return, and did not offer tax benefits that were "too good to be true".

Whether a taxpayer had a subjective profit motive is not dispositive in determining that he acted negligently. Klieger v. Commissioner, T.C. Memo. 1992-734. Under some circumstances, however, a taxpayer may avoid liability for the additions to tax for negligence under section 6653(a) if reasonable reliance on a competent professional adviser is shown. Leonhart v. Commissioner, 414 F.2d 749, 750 (4th Cir. 1969), affg. T.C. Memo. 1968-98; Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Such reliance is not an absolute defense to negligence but is merely a factor to be considered. Freytag v. Commissioner, supra.

For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that the professional adviser had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. Leonhart v. Commissioner, supra; Freytag v. Commissioner, supra; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v. Commissioner, T.C. Memo. 1996-84. Reliance on a professional adviser can be inadequate when the taxpayer and his adviser knew nothing about the nontax business aspects of the venture. Beck v. Commissioner, 85 T.C. 557 (1985); Flowers v. Commissioner, 80 T.C. 914 (1983). In order for reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the reliance must be reasonable, in good faith, and based upon full disclosure. Zfass v. Commissioner, 118 F.3d 184, 188 (4th Cir. 1997), affg. T.C. Memo. 1996-167; Freytag v. Commissioner, supra at 888.

By the time petitioners purchased their interest in Mid Continent in 1983, their tax returns show that they had acquired interests in several partnerships. Petitioner had built "from nothing" a furniture manufacturing business that was capable of providing his family with an income of over $800,000 in 1982 and more than $500,000 in both 1983 and 1984. Although not highly educated in a formal sense, petitioner is articulate and intelligent and has a history of financial success in the

founding and management of his own business.  We would hesitate to call him an "unsophisticated" investor.

Petitioner, however, attempted at trial to demonstrate to the Court his lack of sophistication.  He testified both on direct and cross-examination that because the partnership was assigned a tax shelter number by the IRS, he thought the IRS had "approved" the shelter.  He never asked Corman if this were true, testifying that he believed it as a "matter of trust".  Yet, petitioner identified a Mid Continent subscription agreement that he introduced into evidence.  He testified that he reviewed the agreement before deciding to invest in Mid Continent.  A paragraph in the agreement cautions the reader that no "Federal governmental authority has made any finding or determination relating to the fairness for public investment" in the partnership and that there has been and will be no Federal recommendation or endorsement of the partnership.

Petitioner testified that he invested in the partnership relying on the advice of Corman and other partnership investors. It appears from the record that Corman was paid to perform accounting services for Classic Gallery, not to give investment advice to petitioners.  Petitioner's testimony was also rather vague as to just what specific investment advice Corman gave him about the partnership other than that it was a "good" investment.

See, e.g., Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir. 1992), affg. T.C. Memo. 1991-449.

Petitioner's evidence further fails to show that Corman had any expertise in the nontax, business aspects of Mid Continent, or that he conferred with experts in the field. When questioned as to why he thought Corman was qualified to give oil and gas investment advice, petitioner testified that Corman "served on committees and various programs for different parties for investment purposes", such as "B'nai Brith in Greensboro, a couple of corporations, fabric corporations in Greensboro, and a couple furniture companies in High Point." Petitioner admitted that Corman's only knowledge about the oil and gas industry came from reading partnership investment prospectuses.

Petitioners cite United States v. Boyle, 469 U.S. 241, 251 (1985), for the proposition that taxpayers are entitled to rely on "expert accountants and attorneys for substantive tax advice". What petitioners are attempting to do, however, is to justify relying on the alleged advice of an accountant about an oil and gas investment, a matter in which he had no expertise. We recall petitioner's testimony that when he started his furniture manufacturing business, he did not rely solely on the advice of his friend Corman (who by petitioner's own description had extensive accounting experience in the furniture business). Petitioner, in addition, sought advice from those familiar with

the retail and manufacturing sides of the furniture industry with whom he could discuss his new venture. Petitioner was well aware of what was required for a businesslike approach in order to make an informed investment.

Any investment advice that Corman provided to petitioner about Mid Continent was based solely on Corman's reading of the prospectus and his experience in other than oil and gas ventures. But to accurately report the Mid Continent deductions and credits for 1983 and 1984 required verifying facts outside and independent of the documents presented to Corman. Petitioners have not shown that it was Corman's responsibility to verify those facts. See David v. Commissioner, 43 F.3d 788, 789 (2d Cir. 1995), affg. T.C. Memo. 1993-621; Daugherty v. Commissioner, 78 T.C. 623, 641 (1982). Petitioners cannot avoid the negligence additions to tax "merely because a tax adviser has read the prospectus and advised that it is feasible from a tax perspective, assuming the facts presented are true." Rogers v. Commissioner, T.C. Memo. 1990-619; accord Novinger v. Commissioner, T.C. Memo. 1991-289.

Petitioner argues that there was nothing about the investment that put him on notice that "second-guessing" his accountant's advice was necessary. The tax losses generated by the investment were not "too good to be true", he argues. But for $10,000 petitioner, a high tax bracket taxpayer, purchased

for 1983 alone $46,007 in tax losses.[7]  This represents better than a 4-to-1 writeoff, enough to have put petitioner on "notice that the investment scheme was primarily for a tax purpose." Zfass v. Commissioner, 118 F.3d at 190; Barnard v. Commissioner, 731 F.2d 230, 231 (4th Cir. 1984), affg. Fox v. Commissioner, 80 T.C. 972 (1983); see Goldman v. Commissioner, 39 F.3d 402, 407 (2d Cir. 1994) (Mid Continent offering memorandum promised "improbable tax advantages"), affg. T.C. Memo. 1993-480.

It was a "small" investment, testified petitioner, that did not warrant an expensive investigation, and besides, he argues, the problems that caused the partnership to fail were "technical" in nature.  While the investment may have been small to petitioner, we disagree that a costly investigation was required to reveal the true nature of the partnership.

Petitioner was not an original investor in Mid Continent upon its creation in 1981.  Unlike Fields, from whom he obtained his partnership interest in 1983, petitioner had the benefit of 2 years of operations to observe.  Petitioner did not have to rely merely on the representations of the partnership.  Petitioner testified that he "spoke to" other Mid Continent investors in 1983 before buying Fields' interest.  The only information they

---

[7]In their brief petitioners state that they received a "tax benefit of $24,000 over two years."

and Fields could have given him was that the partnership was suffering large losses, as apparently had been planned.

Petitioner testified that his investment focus was on "finding an oil well." It would have taken only modest effort to determine, likely from the partnership itself, that Mid Continent had not followed through on any of the three stated "profit seeking" activities.

In 1983, after 2 years of operations, the partnership had not drilled for oil and gas in the Overthrust Belt. There was no drilling by the partnership in Oklahoma and Tennessee.[8] And there was still no operational Terra-Drill in existence 2 years after commencement of the license payments for the drill. The nonexistence of the drill is hardly a "technical"[9] matter. The Terra-Drill license payments to Mitchell, financed in large part by long-term notes, were largely responsible for the partnership losses that were passed through to the partners.

We have considered the other arguments raised by petitioners and we find them to be without merit. We find that petitioners

---

[8]Instead of conducting drilling, the partnership substituted partial working interests in other than the original proposed sites. The sites evidently had poor production potential.

[9]The "technical" problems to which petitioners allude are substantial engineering problems that must first be overcome before an operational Terra-Drill can successfully be designed. Because of the technical problems there was no drill. The partnership failed because from the start there was no drill and none was ever developed.

did not reasonably rely in good faith on the advice of a competent expert in reporting their deductions and credits from Mid Continent on their 1983 and 1984 Federal income tax returns. For each return petitioners failed to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances.

## The Effect of Petitioners' Amended Return for 1983

In December of 1986, several months after learning that the Mid Continent partnership return for 1983 would be examined by respondent, petitioners filed an amended joint individual Federal income tax return for tax year 1983. Petitioners argue that when deciding the issue of negligence for 1983, the "entire record", including the amended return, must be considered. According to petitioners, since they reported and paid additional tax, there is no negligent underpayment of tax for 1983; it is vitiated by the amended return.

If the Court nevertheless determines that the negligence additions to tax apply, they argue that as to the section 6653(a)(2) addition of 50 percent of the interest due on the portion of the underpayment that is attributable to negligence, all of the underpayment was paid with the amended return in 1986. Any deficiency that remained, petitioners argue, relates to their deduction of "out-of pocket-expenses" and not to any negligence on their part. Therefore, they argue that the section 6653(a)(2)

addition should be computed based only on the interest accruing on the underpayment that existed between the filing of the original 1983 return and the filing of the amended return in 1986.

Section 6653(a)(1) provides that if any part of any "underpayment" of tax is due to negligence, there shall be added to the tax an amount equal to 5 percent of the "underpayment". Under section 6653(a)(2), in addition to the above amount, there shall be added to the tax an amount equal to 50 percent of the interest due with respect to the portion of the "underpayment" that is due to negligence.

For purposes of section 6653, the term "underpayment" is defined in section 6653(c)(1) for income tax as:

> a deficiency as defined in * * * [section 6211] (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *

Therefore, for purposes of determining the existence and amount of any "underpayment" of tax for purposes of the negligence additions of section 6653(a)(1) and (2), the additional tax shown on petitioners' amended return for 1983 cannot be considered.[10] Crocker v. Commissioner, 92 T.C. 899, 916 (1989); Emmons v.

---

[10]The last date prescribed for filing petitioners' Federal income tax return for 1983 was Apr. 15, 1984. Secs. 6672, 6012.

Commissioner, 92 T.C. 342, 348-349 (1989), affd. 898 F.2d 50 (5th Cir. 1990); Deel v. Commissioner, T.C. Memo. 1990-545.

Conclusion

We find that petitioners are liable for the section 6653(a)(1) and (2) additions to tax for the years 1983 and 1984 as determined by respondent.

Decision will be entered

for respondent.