T.C. Memo. 2001-177

UNITED STATES TAX COURT

THOMAS N. CARMENA, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3412-99.                    Filed July 19, 2001.

<u>Barbara Sue Geil</u>, for petitioner.

<u>Timothy S. Sinnott</u>, for respondent.


MEMORANDUM OPINION

COUVILLION, <u>Special Trial Judge</u>: Respondent determined that

petitioner was liable for the following additions to tax for the

year 1982: $523 under section 6653(a)(1),[1] 50 percent of the

---

[1]    Unless otherwise indicated, all section references are
to the Internal Revenue Code in effect for the year at issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

interest due on a deficiency of $10,459 under section 6653(a)(2), and $2,615 under section 6661.

The issues for decision are: (1) Whether petitioner is liable for the additions to tax under section 6653(a)(1) and (2) for negligence, and (2) whether petitioner is liable for the addition to tax under section 6661 for a substantial understatement of tax. The issues in this case relate to the participation of petitioner as a limited partner in a partnership known as Utah Jojoba I Research (Utah I or the partnership).[2]

Some of the facts were stipulated, and those facts, with the annexed exhibits, are so found and are incorporated herein by reference. At the time the petition was filed, petitioner's legal residence was Las Vegas, Nevada.

Petitioner is a medical doctor whose particular area of specialty is internal medicine. Petitioner has practiced internal medicine in the Las Vegas, Nevada, area since 1962. Petitioner became acquainted with Dr. William K. Stephan (Dr. Stephan), a retired anesthesiologist who had taken steps to become a licensed investment adviser. Dr. Stephan approached petitioner about investing in Utah I, which was being promoted as

---

[2] The stipulation of facts in this case reflects that the actual participant in Utah I was the Neil Carmena Family Trust, a grantor trust of which petitioner was the grantor and whose income and deductions were reported as petitioner's on his Federal income tax returns. For simplicity, the Court refers to petitioner as the participant in Utah I.

an agricultural research and development partnership. Dr. Stephan had learned of the Utah I partnership from one of its promoters, Gary Sheets (Mr. Sheets), who was affiliated with Coordinated Financial Services (CFS) in Salt Lake City, Utah.

Dr. Stephan provided petitioner with a fairly voluminous private placement memorandum[3] (the offering), which described the proposed investment in and the activities to be conducted through Utah I. Petitioner claims that he read the offering; however, petitioner does not specifically recall reading certain portions of the offering regarding the risks associated with investment.[4] Petitioner alleges that he passed along the offering to his certified public accountant, Joe Salgo (Mr. Salgo), who routinely prepared petitioner's Federal income tax returns. Petitioner further alleges that Mr. Salgo gave a favorable response to petitioner's potential investment in Utah I, although petitioner cannot recall any specific conversation he had with Mr. Salgo regarding Utah I.

---

[3] The private placement memorandum consisted of some 47 pages, plus 8 exhibits, and a table of contents.

[4] When questioned at trial about reading the offering petitioner responded, "I'm sure I read it". However, when asked whether he recalled reading certain portions of the offering dealing with the risk factors and highly speculative nature of the investment, petitioner could not recall reading those portions. The Court surmises from petitioner's testimony that, if he did read the offering at all, he certainly did not accomplish a thorough review thereof.

Petitioner did not consult an attorney or any independent expert in the area of agriculture or jojoba plants regarding whether jojoba oil or any other jojoba derivative had a potentially lucrative commercial market. Petitioner, nevertheless, invested in Utah I.

On his 1982 Federal income tax return, petitioner reported wages of $168,000 from his medical practice, interest income of $33,124, taxable dividend income of $6,934, and capital gains of $6,659. Petitioner reported total net losses of $116,187 from various partnerships and a parcel of rental real estate, of which $20,919 represented the loss from Utah I. Thus, petitioner reported total income of $103,830 and a total tax liability of $26,438.

Utah I was audited by the Internal Revenue Service and a Notice of Final Partnership Administrative Adjustment was issued to the partnership. The partnership initiated a TEFRA proceeding in this Court and a decision was entered in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6. In the decided case, this Court held that the partnership did not directly or indirectly engage in research or experimentation and that the partnership lacked a realistic prospect of entering into a trade or business. In upholding respondent's disallowance of research and experimental expenditures, the Court found that the agreements between the partnership and the proposed research and

development contractor, U.S. Agri Research & Development Corp. (U.S. Agri), had been designed and entered into solely to provide a mechanism to disguise the capital contributions of limited partners as currently deductible expenditures.  The Court stated that the activities of the partnership were "another example of efforts by promoters and investors in the early 1980's to reduce the cost of commencing and engaging in the farming of jojoba by claiming, inaccurately, that capital expenditures in jojoba plantations might be treated as research or experimental expenditures for purposes of claiming deductions under section 174."  Id.

As a result of Utah I's TEFRA proceeding, petitioner was assessed a tax deficiency of $10,459 for 1982, plus interest. Subsequently, respondent issued a notice of deficiency to petitioner for 1982 for affected items, determining that petitioner was liable for the additions to tax for negligence under section 6653(a)(1) and (2), and a substantial understatement of tax under section 6661 for 1982.  These additions to tax are the subject of the instant case.

The first issue is whether petitioner is liable for the additions to tax for negligence under section 6653(a)(1) and (2) for 1982.  Section 6653(a)(1) imposes an addition to tax in an amount equal to 5 percent of an underpayment of tax if any part of the underpayment is due to negligence or intentional disregard

of rules or regulations.  Section 6653(a)(2) imposes another addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.  Respondent's determinations in a notice of deficiency are presumed correct, and petitioner must establish otherwise.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); cf. sec. 7491(c).[5] Respondent determined that petitioner's underpayment was due to negligence.  Petitioner, therefore, has the burden of proving he was not negligent in deducting his share of the partnership's losses.  See Estate of Mason v. Commissioner, 64 T.C. 651, 663 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Anderson v. Commissioner, T.C. Memo. 1993-607, affd. 62 F.3d 1266 (10th Cir. 1995).

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would exercise under like circumstances.  See Anderson v. Commissioner, 62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607;

---

[5]      The Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726, added sec. 7491(c), which places the burden of production on the Secretary with respect to a taxpayer's liability for penalties and additions to tax in court proceedings arising in connection with examinations commencing after July 22, 1998.  Petitioner does not contend, nor is there evidence, that his examination commenced after July 22, 1998, or that sec. 7491 is applicable in this case.

Neely v. Commissioner, 85 T.C. 934, 947 (1985); Glassley v. Commissioner, T.C. Memo. 1996-206. The focus of inquiry is on the reasonableness of the taxpayer's actions in light of his experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973); Greene v. Commissioner, T.C. Memo. 1998-101, affd. without published opinion 187 F.3d 629 (4th Cir. 1999); Glassley v. Commissioner, supra; Turner v. Commissioner, T.C. Memo. 1995-363. Whether a taxpayer is negligent in claiming a tax deduction "depends upon both the legitimacy of the underlying investment, and due care in the claiming of the deduction." Sacks v. Commissioner, 82 F.3d. 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217; see Greene v. Commissioner, supra.

A taxpayer may avoid liability for negligence penalties under some circumstances if the taxpayer reasonably relied on competent professional advice. See Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other issue 501 U.S. 868 (1991). Such reliance, however, is "not an absolute defense to negligence, but rather a factor to be considered." Id. For reliance on professional advice to relieve a taxpayer from the negligence addition to tax, the taxpayer must show that the professional adviser had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter. See id.

The facts pertinent to the instant case, relating to the structure, formation, and operation of Utah I are as discussed in Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6. Utah I was organized in December 1982 as a limited partnership for the described purpose of conducting research and development (R & D) involving the jojoba plant. The offering, prepared by CFS and dated November 10, 1982, provided for a maximum capitalization of $2,968,000 consisting of 350 limited partnership units at $8,480 per unit. Each unit required a cash downpayment of $2,500 and a noninterest-bearing promissory note in the principal amount of $5,980 payable in 10 annual installments with an acceleration provision in the event of default. The offering was limited to investors with a net worth (exclusive of home, furnishings, and automobiles) of $150,000, or investors whose net worth was $50,000 (exclusive of home, furnishings, and automobiles), and who anticipated that, for the taxable year of the investment, they would have gross income equal to $65,000, or taxable income, a portion of which, but for tax-advantaged investments, would be subject to a Federal income tax rate of 50 percent. Each limited partner also was required to execute a limited guaranty agreement in which he or she guaranteed a proportionate share of partnership debt to U.S. Agri.

Petitioner's investment was for four limited partnership units, which required an initial down payment of $10,000 and

execution of a promissory note for $23,920. Petitioner was to make payments of $2,600 each year from 1983 through 1985, $2,100 per year from 1986 through 1991, and a final payment of $3,520 in 1992 on the promissory note. The record reflects that petitioner actually paid $10,000 in 1982, $2,600 per year from 1983 through 1985, $2,100 per year from 1986 through 1988, and $8,276 in 1989, totaling $32,376.[6]

The offering identified William Kellen (Mr. Kellen) as the general partner and U.S. Agri as the contractor for the R & D program under an R & D agreement. Additionally, a license agreement between Utah I and U.S. Agri granted U.S. Agri the exclusive right to utilize technology developed for Utah I for 40 years in exchange for a royalty of 85 percent of all products produced. The offering included copies of both the R & D agreement and the license agreement. The R & D agreement was executed concurrently with the license agreement.

According to its terms, the R & D agreement expired upon the partnership's execution of the license agreement. Since the two were executed concurrently, amounts paid to U.S. Agri by the partnership were not paid pursuant to a valid R & D agreement but were passive investments in a farming venture under which the

---

[6] Apparently, in 1989, petitioner executed a ratification agreement that allowed him to pay off the balance of the promissory note; i.e., $2,100 per year for 1990 and 1991 and $3,520 for 1992, at a 20-percent discount.

investors' return, if any, was to be in the form of a royalty pursuant to the licensing agreement. Thus, as this Court held in Utah Jojoba I Research v. Commissioner, supra, the partnership was never engaged in research or experimentation, either directly or indirectly. Moreover, this Court found in Utah Jojoba I Research v. Commissioner, supra, that U.S. Agri's attempts to farm jojoba commercially did not constitute research and development, thereby concluding that the R & D agreement was designed and entered into solely to decrease the cost of participation in the jojoba farming venture for the limited partners through large up-front deductions for expenditures that were actually capital contributions. The Court concluded further that the partnership was not involved in a trade or business and had no realistic prospect of entering into a trade or business with respect to any technology that was to be developed by U.S. Agri.

Petitioner contends that his investment in Utah I was motivated solely by the potential to earn a profit. Petitioner contends further that his reliance on the advice of his certified public accountant, Mr. Salgo, and his investment adviser, Dr. Stephan, should absolve him of liability for the negligence penalty in this case. Petitioner also argues that, taking into account his experience and the nature of the investment in Utah I, he exercised the due care that a reasonable and ordinarily

prudent person would have exercised under like circumstances. For the reasons set forth below, the Court disagrees with petitioner's contentions.

First, the principal flaw in the structure of Utah I was evident from the face of the very documents included in the offering.  A reading of the R & D agreement and licensing agreement, both of which were included as part of the offering, plainly shows that the licensing agreement canceled or rendered ineffective the R & D agreement because of the concurrent execution of the two documents.  Thus, the partnership was never engaged, either directly or indirectly, in the conduct of any research or experimentation.  Rather, the partnership was merely a passive investor seeking royalty returns pursuant to the licensing agreement.  Any experienced attorney capable of reading and understanding the subject documents should have understood the legal ramifications of the licensing agreement canceling out the R & D agreement.  However, petitioner never consulted an attorney in connection with this investment, nor did he carefully read the offering himself.[7]

---

[7]    Petitioner testified that he retained the services of an attorney named Bob Clark (Mr. Clark) to prepare wills and various contracts, incorporate his medical practice, and form the Neal Carmena Family Trust.  Petitioner, however, failed to seek Mr. Clark's advice with respect to a potential investment in Utah I.

- 12 -

Secondly, in making his investment in Utah I, petitioner purportedly relied on the advice of his certified public accountant, Mr. Salgo, and Dr. Stephan, who was selling interests in the partnership and receiving commissions for each sale. Mr. Salgo testified that Dr. Stephan was the first person to present him with a copy of the offering and that was for the purpose of Mr. Salgo's own potential investment in Utah I. Mr. Salgo could not specifically remember whether petitioner actually forwarded a copy of the offering to him for review, nor could Mr. Salgo remember actually discussing the partnership with petitioner or rendering any sort of advice with respect to petitioner's potential investment therein.[8] Mr. Salgo did not provide a written opinion to petitioner in connection with Utah I, nor did Mr. Salgo conduct any independent research or consult any type of agricultural or jojoba plant expert about the investment. The record in this case indicates that, if indeed Mr. Salgo rendered any advice at all to petitioner about Utah I, Mr. Salgo relied solely on the representations made in the offering in giving such advice.

Moreover, the record lacks evidence to show whether Mr. Salgo had any previous experience with the deductibility of

---

[8] Notably, petitioner was also unable to recall whether he delivered a copy of the offering to Mr. Salgo, or whether Mr. Salgo specifically rendered any advice to him with respect to his potential investment in Utah I.

research and development expenses at the time he advised petitioner about Utah I. These types of expenses would have allowed petitioner certain tax benefits above and beyond what would have been provided by an ordinary business deduction. There is no evidence in the record to suggest that Mr. Salgo conducted any independent investigation to determine whether the specific research and development proposed to be conducted by or on behalf of the partnership would have qualified for deductions under section 174. The Court also finds it notable that Mr. Salgo had no educational background or experience in the area of agricultural pursuits in general, or jojoba plants in particular.

There is no evidence in the record to suggest that, even if Mr. Salgo did advise petitioner to invest in Utah I, petitioner ever questioned Mr. Salgo about the facts and/or legal analysis upon which he based his recommendations. Further, the record is devoid of any evidence that petitioner asked Mr. Salgo to explain the Utah I investment to him, which would seem particularly important given the fact that petitioner obviously did not exhaustively review the offering himself.

The facts in this case are similar to those in Glassley v. Commissioner, T.C. Memo. 1996-206, in which this Court found that the taxpayers:

> acted on their fascination with the idea of participating in a jojoba farming venture and their satisfaction with tax benefits of expensing their investments, which were clear to them from the promoter's presentation. They passed the offering circular by their accountants for a "glance" * * *.

Similarly, petitioner in this case acted on an enthusiasm for the potential uses of jojoba and acted with knowledge of the tax benefits of making the investment. This record fails to reflect with any certainty that Mr. Salgo actually rendered any advice to petitioner in connection with Utah I. However, the record suggests that what little advice Mr. Salgo may have given to petitioner was highly generalized and based primarily on a mere cursory review of the offering rather than on independent knowledge, research, or analysis. Petitioner failed to show that Mr. Salgo had the expertise and knowledge of the pertinent facts to provide informed advice on the investment in Utah I. See Freytag v. Commissioner, 89 T.C. at 888. Accordingly, petitioner failed to establish that his reliance on the advice of Mr. Salgo was reasonable or in good faith. See Glassley v. Commissioner, supra.

The Court next examines petitioner's reliance on the advice of Dr. Stephan. Dr. Stephan had no background or expertise in the areas of agriculture or jojoba plants. More importantly, because Dr. Stephan earned a commission on each sale of Utah I interests, and thus had a personal profit motive in selling this

investment to clients, he had a conflict of interest in advising petitioner to purchase the limited partnership interests.[9] The advice petitioner allegedly received from Dr. Stephan fails as a defense to negligence due to his lack of competence to give such advice and the clear presence of a conflict of interest. See Rybak v. Commissioner, 91 T.C. 524, 565 (1988). Petitioner's reliance on the advice of Dr. Stephan was unreasonable under the circumstances.

Outside of Mr. Salgo and Dr. Stephan, petitioner made no other inquiry into the viability of this partnership's proposed research and operations. The Court finds it notable that the offering listed at least 15 "potential uses of jojoba nuts", yet petitioner failed to explore the plausibility of any of those potential uses. Some of the potential uses listed in the offering were various lubricants for high-speed or high-temperature machinery, cosmetics, shampoos and soaps, sunscreens, pharmaceuticals, cooking oils, disinfectants, polishing waxes, corrosion inhibitors, candles, animal feed supplements, and fertilizer. Being a physician, it seems logical that petitioner would have had some access to information about the use of jojoba in the pharmaceutical arena; however, petitioner failed to pursue

---

[9] Petitioner acknowledged in his testimony that he believed Dr. Stephan was receiving commissions for finding investors to purchase the limited partnership interests.

this possibility. Petitioner's failure to investigate independently any of the enumerated potential uses of jojoba plants was unreasonable under the circumstances.

Petitioner had no legal or agricultural background or training; yet, he consulted no source of such information prior to investing more than $30,000 in Utah I. At a minimum, petitioner could have contacted an attorney to review the offering, provide legal advice surrounding the partnership, and explain the legal ramifications of the licensing agreement canceling out the R & D agreement. A reasonable and ordinarily prudent investor under the circumstances would have consulted an attorney. Also, petitioner could have taken the simple step of contacting the agricultural department of a nearby college or university or going to another reliable source to inquire about the research and development of jojoba plants and their potential commercial usage, if any. Again, a reasonable and ordinarily prudent investor would have at least attempted to make this type of inquiry under the circumstances.[10]

Petitioner was not a naive investor and should have recognized the need for independent professional advice. See

_____

[10] In Utah Jojoba I Research v. Commissioner, T.C. Memo. 1998-6, the Court noted that there were experimental jojoba plantations located at the University of California at Riverside, California, of which the general partner of Utah I, Mr. Kellen, was aware.

LaVerne v. Commissioner, 94 T.C. 637, 652 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. in part without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Glassley v. Commissioner, T.C. Memo. 1996-206. In fact, the offering cautioned that prospective investors should not "construe this memorandum or any prior or subsequent communications as constituting legal or tax advice" and urged investors to "consult their own counsel as to all matters concerning this investment." The offering was replete with statements, including the cover page statement that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK", warning of tax risks involved with the investment and the highly speculative nature of the commercial viability of the jojoba plant. The offering contained inconsistent information, such as the statement on page 9 that the general partner "has limited experience in dealing in Jojoba beans and is mainly relying on the R & D Contractor to develop technology and plant cultivars over the term of the R & D Agreement", contrasted with the statement on page 34 that the general partner "pioneered the development of the Blythe Airport as an alfalfa ranch and jojoba farming in Desert Center" and was "familiar with the development of jojoba, citrus, vineyards, alfalfa and asparagus." Such inconsistencies should have raised a healthy suspicion in the mind of a reasonable and ordinarily prudent investor, even one lacking any legal, tax, or

agricultural background.  However, petitioner did not diligently read the offering, nor did he make an effort to have the investment explained to him prior to committing to invest some $33,000 in Utah I.

The Court is mindful that the Court of Appeals for the Ninth Circuit (Ninth Circuit), the court to which an appeal in this case would lie, has held that experience and involvement of the general partner and the lack of warning signs could reasonably lead investors to believe they were entitled to deductions in light of the undeveloped state of the law regarding section 174. See Kantor v. Commissioner, 998 F.2d 1514 (9th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1990-380.  In its holding, the Ninth Circuit explained that the Supreme Court's decision in Snow v. Commissioner, 416 U.S. 500 (1974), left unclear the extent to which research must be "in connection with" a trade or business for purposes of qualifying for an immediate deduction under section 174.  However, in the instant case, the partnership was neither engaged in a trade or business nor conducting research and development, either directly or indirectly. Additionally, the experience in jojoba research and development of the general partner of Utah I, Mr. Kellen, was questionable, at best, as evidenced by conflicting statements in the offering. Also, it is apparent from the evidence presented in this case that Mr. Kellen had minimal involvement in the partnership.

Petitioner is precluded from relying upon a "lack of warning" as a defense to negligence, when there is no evidence that a reasonable investigation was ever made, and the offering materials contained many warnings of the tax risks associated with the investment.

On this record, the Court finds that petitioner did not exercise the due care of a reasonable and ordinarily prudent person under the circumstances. Consequently, the Court holds that petitioner is liable for the negligence additions to tax, under section 6653(a)(1) and (2) for 1982. Respondent is sustained on this issue.

The second issue is whether petitioner is liable for the addition to tax under section 6661(a) for a substantial understatement of tax for 1982. Section 6661(a), as amended by the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat. 1951, provides for an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax for the taxable year. A substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $5,000. See sec. 6661(b)(1)(A). Generally, the amount of an understatement is reduced by the portion of the understatement that the taxpayer shows is attributable to either (1) the tax treatment of any item

for which there was substantial authority, or (2) the tax treatment of any item with respect to which the relevant facts were adequately disclosed on the return. See sec. 6661(b)(2)(B). If an understatement is attributable to a tax shelter item, however, different standards apply. First, in addition to showing the existence of substantial authority, a taxpayer must show that he reasonably believed that the tax treatment claimed was more likely than not proper. See sec. 6661(b)(2)(C)(i)(II). Second, disclosure, whether or not adequate, will not reduce the amount of the understatement. See sec. 6661(b)(2)(C)(i)(I).

Substantial authority exists when "the weight of authorities supporting the treatment is substantial in relation to the weight of the authorities supporting contrary positions." See sec. 1.6661-3(b)(1), Income Tax Regs. Petitioner has failed to present evidence to show that substantial authority existed for the tax treatment of the Utah I loss on his 1982 return.

Adequate disclosure of the tax treatment of a particular item may be made either in a statement attached to the return or on the return itself, if it is in accordance with the requirements of Rev. Proc. 83-21, 1983-1 C.B. 680. See sec. 1.6661-4(b) and (c), Income Tax Regs. The record indicates that petitioner did not attach a statement to his 1982 return disclosing the specific facts surrounding his Utah I loss deduction. Rev. Proc. 83-21, supra, applicable to tax returns

filed in 1983, lists information that would be deemed sufficient disclosure if listed on the return itself, without the necessity of attaching an additional statement to the return. However, none of the specific tax items referenced in Rev. Proc. 83-21, supra, are relevant to the instant case. If disclosure is not made in compliance with the regulations or the revenue procedure, adequate disclosure on the return may still be satisfied if sufficient information is provided to enable respondent to identify the potential controversy involved. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). A mere claiming of the loss, however, without further explanation, is not sufficient to alert respondent to the controversial section 174 deduction of which the partnership loss consisted. Petitioner has failed to present evidence to show that the relevant facts pertaining to his Utah I loss deduction were adequately disclosed on his 1982 return.[11]

Finally, section 6661(c) provides the Secretary with the discretion to waive the section 6661(a) addition to tax if the taxpayer shows he acted with reasonable cause and in good faith. This Court reviews the Secretary's failure to waive the addition to tax for abuse of discretion. See Martin Ice Cream Co. v.

---

[11] As noted earlier, even if an adequate disclosure had been made on the return, such disclosure would not reduce the amount of the understatement attributable to a tax shelter item.

Commissioner, 110 T.C. 189, 235 (1998).  Petitioner argues that
he acted in good faith and reasonably relied upon the advice of
Mr. Salgo and Dr. Stephan in claiming the relevant loss.
However, nothing in the record indicates that petitioner
requested a waiver for good faith and reasonable cause under
section 6661(c).  In the absence of such a request, this Court
cannot review respondent's determination for an abuse of
discretion.  See id.  In any event, petitioner has not shown that
he met the tests of reasonable cause and good faith.

Petitioner has failed to prove that he had substantial
authority for his treatment of the partnership loss and that he
adequately disclosed the relevant facts of that treatment.  The
understatement upon which the addition to tax was imposed was
$10,459.  The understatement is substantial because it exceeds
the greater of $5,000 or 10 percent of the amount required to be
shown on the return.[12]  On this record, the Court holds that
petitioner is liable for the addition to tax under section
6661(a) for a substantial understatement of tax for 1982.
Respondent is sustained on this issue.

---

[12]    The amount required to be shown on the return was
$40,915, 10 percent of which equals $4,091.50.

Finally, to the extent the Court has failed to address an argument of petitioner herein, the Court concludes such argument is without merit.

<u>Decision will be entered</u>

<u>for respondent.</u>